[Civ. No. 32412.   Second Dist., Div. Five.   Apr. 8, 1969.]

OPAL BARTON, Plaintiff, Cross-defendant and Appellant, v. WHITE OAK REALTY, INC., et al., Defendants, Cross-complainants and Respondents.

Weitkamp, Riddle & Bedrosian and Frederick J. Weitkamp for Plaintiff, Cross-defendant and Appellant.

Milton Zerin and Morton Minikes for Defendants, Cross-complainants and Respondents.

KAUS, P. J.—Plaintiff and cross-defendant Opal Barton appeals from a judgment to the effect that she take nothing by her complaint and that defendant and cross-complainants recover $16,470 as follows: cross-complainants· White Oak Realty, Inc., Macy Coffin and Geraldine Coffin, jointly— $4.500; cross-complainant Showcase Properties. Inc., $7,182; and cross-complainant, White Oak Realty. Inc., $4,788.

This litigation is the result of an abortive real estate transaction, White Oak Realty Inc. ("White Oak") and the Coffins owned a medical building in Encino, California. White

Oak is also a licensed real estate broker. On January 14, 1965, Mrs. Barton signed a deposit receipt, in which she offered to buy the building for $192 500. Showcase Properties, Inc. ("Showcase") was the broker involved. With respect to the commission, the document provides that Showcase was to receive "60% of 6%." On January 16 the owners made a counteroffer to sell for $199,500. One of the conditions of the counteroffer read as follows: "Commission is to be paid Showcase Properties on a 60/40 basis, as one of the principals is a Licensed Real Estate Broker." Mrs. Barton accepted. On January 25, an escrow was opened and both sides signed escrow instructions. One of the instructions to the escrow holder, signed on behalf of White Oak, read as follows: "You are instructed to pay commission as follows: $7.182.00 to Showcase Properties, Inc. $4,788.00 to White Oak Realty. $11,970.00—total commission." On May 18 Mrs. Barton wrongfully refused to complete the purchase and demanded the return of $5,000 which she had deposited in the escrow. On July 12 she sued White Oak, the Coffins and the escrow company for the return of the deposit. The escrow company interpleaded the money.[1] White Oak and the Coffins cross-complained as owners, claiming damages in the sum of $39,500, the alleged difference between the market value of the property and the contract price.[2] White Oak and Showcase, as brokers, cross-complained, claiming that in addition to the $39,500 they were entitled to their commissions in the sums of $4,788 and $7,182 respectively. After a trial the court found that the owners had not overreached themselves as much as they had thought and that the difference between the purchase price and the market value was only $4,500. It awarded' that sum to the owners and the commissions, as prayed, to the brokers. The allowance of the commissions is the only issue on appeal.

It will aid in analyzing the problems posed by this appeal to ignore, for the moment, the dual status of White Oak as an owner, as well as a broker. After stating what we believe to be

---

[1] The owners also claimed and recovered additional damages not here in issue. These additional damages consisted of certain escrow charges which the escrow company was permitted to deduct from the money deposited with it.

[2] Technically the correct measure of damages is the difference between the purchase price and "the value of the property" to the seller. (Civ. Code, § 3307), but "[a]s a general rule, the value to the seller of the property is the market value at the time of the breach [citation]." (*Van Buskirk* v. *McClenahan*, 163 Cal.App.2d 633, 636 [329 P.2d 924].)

the applicable law concerning the defaulting buyer's liability for brokers' commissions, we will then discuss more particularly how this liability is affected by the fact that one of the sellers was to receive part of the commission.

Although the pleadings are a little vague on the point, the findings and conclusions, the judgment and, indeed, cross-complainants' counsel's statement to this court at the time of the oral argument, make it perfectly clear that it was—and still is—his theory, that Mrs. Barton is liable for the commissions by reason of no other fact than that the owners had decided to stand on their contract with her and to sue her for and recover damages. In this view it is immaterial whether or not the brokers had earned their commissions when the breach occurred.[3]

In other words, to put the cross-complaint in its proper perspective, it is important to understand what it is not: it is not a suit by the brokers against the buyer on the theory that they are third party beneficiaries of a promise made by the buyer to the seller to pay the broker's commission (*Calhoun v. Downs*, 211 Cal. 766, 770-771 [297 P. 548]; *Lane v. Davis*, 172 Cal.App.2d 302, 308-309 [342 P.2d 267]; *Watson v. Aced*, 156 Cal.App.2d 87, 91-92 [319 P.2d 83]); it is not a suit based on a theory that the buyer's default was a direct wrong against the brokers in that it prevented them from earning the commission;[4] nor, since the brokers did not sue the owners, is it their theory that, regardless of whether this successful action for damages against Mrs. Barton was brought by the owners, the commission had already been earned. (*Collins v. Vickter Manor, Inc.*, 47 Cal.2d 875, 881 [306 P.2d 783].)

The fact that the trial court went along with the theory on which cross-complainants did try the case is clearly shown

---

[3]Although the court's minute order for judgment recited that ". . . seller became obligated to pay real estate brokers' commissions of $7,182.00 to defendant Showcase Properties and $4,788.00 to White Oak Realty, a total of $11,970.00 . . . ," the formal findings, signed 21 days later, contain no comparable language. We do not know whether the change was inadvertent or purposeful.

[4]Whether or not California recognizes such an action is not clear. Compare *Steinberg v. Buchman*, 73 Cal.App.2d 605, 609-610 [167 P.2d 207] with *Williams v. Krumsiek*, 109 Cal.App.2d 456, 457-459 [241 P.2d 40]; *Herman v. Savage*, 17 Cal.App.2d 238, 243 [61 P.2d 1195]; *Coffman v. Crookshank*, 140 Cal.App. 192 [34 P.2d 1067]; and *Traxler v. Katz*, 116 Cal.App. 226 [2 P.2d 553]. See authorities cited in Continuing Education of the Bar, California Real Estate Sales Transactions (1967) section 5.81. See also 12 C.J.S. Brokers, section 82; 12 Am.Jur.2d Brokers, section 164.

from the conclusions of law which it signed: "Cross-complainants WHITE OAK REALTY, INC., MACY COFFIN and GERALDINE COFFIN are entitled to recover on their cross-complaint against cross-defendant OPAL BARTON damages in the sum of $16,470.00 *to be apportioned and paid pro rata as collected* among cross-complainants WHITE OAK REALTY, INC., MACY COFFIN, GERALDINE COFFIN and SHOWCASE PROPERTIES, INC. as follows:

"A. $4,500.00 to WHITE OAK REALTY, INC., MACY COFFIN and GERALDINE COFFIN, being the difference between the contract price and the fair market value of subject real property on the date of breach;

"B. $7,182.00 to SHOWCASE PROPERTIES, INC. for real estate broker's commission; and

"C. $4,788.00 to WHITE OAK REALTY, INC. for real estate broker's commission." (Italics added.)

Almost identical language concerning apportionment and pro rata payment of the judgment "as collected" appears in the judgment itself.

In other words, the owners, just by suing and recovering on the contract, rendered themselves liable for the commission and were entitled to be reimbursed therefor by Mrs. Barton. On no other theory can we explain the judgment against her, coupled with the pro rata apportionment of sums collected.

Cross-complainants' theory derives wholly from *Lesser* v. *W. B. McGerry & Co., Inc.*, 121 Cal.App. 193 [8 P.2d 1058] and a dictum in *Peak* v. *Jurgens*, 5 Cal.App.2d 573 [43 P.2d 569]. In *Lesser*, the owner had agreed to sell property for $85,375, net to him. The purchasers had agreed to pay $86,500, leaving a difference of $1,125 for the broker. The purchasers then refused to proceed. A settlement was negotiated between them and Lesser pursuant to which they paid Lesser $2,150 and assigned to him whatever rights they had in a deposit of $1,000 held by the broker. Lesser then sued for the deposit and lost in the trial court. This result was upheld on appeal. The court first conceded that if Lesser had done nothing after the purchasers' default, the broker would not have been entitled to his commission "there being no legal duty upon the seller after default by the buyer to take legal steps to enforce the contract for the brokers' benefit." (121 Cal.App. at p. 196.) If, however, the seller takes the initiative to enforce the contract "he should not be permitted to ignore and sacrifice the brokers' interest in the contract and enforce it solely for his own benefit." Then, likening the settlement to a suit on the contract, the court reasoned as follows:

". . . . If the contract had been fully performed, respondents would have received $1125 thereunder, and *in a suit against the buyers for its breach that $1125 would have entered properly as an element of damage.* Appellant having undertaken to settle the damages by way of compromise, the same damages must be held to have been in contemplation of the parties. . . ." (121 Cal.App. at pp. 197-198. Italics added.)[5]

For the present, there is no need to quarrel with *Lesser* to the extent that it talks about the rights between the seller and the broker. The most that can be read into the case is a dictum[6] that by enforcing the contract by an action against the buyer for its breach, the seller makes himself liable for a commission which, because of the breach, had not theretofore been earned. Cross-complainants, however, go one giant step further. They contend that because by suing and recovering on their contract they became liable for the commission, the defaulting buyer in turn became liable to them. This only follows if, as a general rule, a defaulting buyer must pay a commission for which the seller has become obligated in spite of the fact that the sale was not consummated. If this unarticulated major premise of cross-complainants' argument is wrong, its entire structure collapses. Examination of the law discloses that they are demonstrably in error.

To date the alpha and omega of the law concerning the nature and extent of the liability of the defaulting buyer for expenses caused by his default is *Royer* v. *Carter,* 37 Cal.2d 544 [233 P.2d 539]. The facts were as follows: Carter had agreed to buy Royer's house for $24,000. She defaulted. Three months later Royer resold the property for $18,500. The trial court awarded Royer the difference between $24,000 and $18,500, plus expenses incurred in connection with the sale to Carter, less a down payment which Royer had retained. The Supreme Court first held that the retention of the deposit was

[5]*Peak* v. *Jurgens,* 5 Cal.App.2d 573 [43 P.2d 569], was a broker's action for his commission, allegedly earned although the sale was never completed, the buyer having rejected the seller's title. The seller was the defendant. Before the action the seller had sued to recover a $5,000 deposit from the escrow holder and the buyer. One of the broker's contentions was that by suing to recover the deposit, the seller "stood on the contract and sought and obtained damages for its breach" thereby entitling the broker to his commission. In the course of a general discussion concerning the various options open to the seller after the buyer's default, the court said that "it may be conceded that the broker would be entitled to his commission" if the seller sued for damages. It then held, however, that by simply asking to recover the deposit, he was merely forfeiting the buyer's rights and that the sale could not be regarded as consummated.

[6]See footnote 9 below.

not inconsistent with Royer's right to hold Carter liable for damages, but because the trial court based its finding of market value on the time of the resale, rather than the time of Carter's breach, the judgment had to be reversed. The court then turned to the question of expenses. ▪ It first noted that all the seller was entitled to was to be made whole. Royer therefore could not recover expenses which would have come out of her pocket, had the deal been consummated.

On the other hand merely giving a seller the difference between the purchase price and the market value, does not really make him whole, because in an action for damages the court cannot turn his land into cash. To be placed in the position in which he would have been had the buyer not defaulted, he must be allowed the expenses of a resale at the market value at the time of the breach.

Application of these principles to *Royer* was as follows: the broker's fee in connection with the first sale would have been $1,200, but Royer had paid only $420—slightly less than half of what was left of the deposit after proved expenses—a saving of $780. This saving was to be treated as a credit. ". . . On retrial, the trial court, in computing the additional damages caused by defendant's breach, should allow an amount equal to the difference between the *cost of selling the property at its value at the time of the breach* and $780, the amount the anticipated expenses of the first sale were reduced by defendant's default." (37 Cal.2d at p. 551. Italics added.)

The important thing to note is that the court, in the italicized portion of the quote, is not talking about the actual resale of the property, but about a hypothetical resale at the market value at the time of the breach. The fact that there had been a resale was immaterial.[7]

---

[7]This appears to be the view of Professor Bernhardt, the author of the chapter on "Liability For Breach" in California Continuing Education of the Bar, California Real Estate Sales Transactions (1967), section 11.59: "If there is no second sale, a court may conclude that the wasted expenses of the first sale are roughly equivalent to the expenses of a hypothetical second sale." 1 Miller and Starr, Current Law of California Real Estate (1965) page 320, does not consider the precise problem that arises when there is no actual resale. The authors do state that the correct measure of damages is the cost of resale, rather than the expenses incurred in connection with the original sale. They correctly cite *Allen* v. *Enomoto*, 228 Cal.App.2d 798, 804 [39 Cal.Rptr. 815], and, of course, *Royer* v. *Carter*, 37 Cal.2d 544 [233 P.2d 539], for that proposition. The authors incorrectly also cite *Fry* v. *George Elkins Co.*, 162 Cal.App.2d 256 [327 P.2d 905] which was not an action for damages. *Fry*, like *Caplan* v. *Schroeder*, 56 Cal.2d 515 [15 Cal.Rptr. 145, 364 P.2d 321] and

While the *Royer* formula is a good deal more complicated than the simple notion that the defaulting buyer is liable for expenses incurred in connection with the original sale, it makes a lot more sense. If the seller recovers expenses, including commissions, which he himself would have been obligated to pay, and recovers the difference between the purchase price and the market value to boot, he is prima facie placed in a better position by the buyer's default. This result is directly prohibited by section 3358 of the Civil Code.[8] On the other hand, not to award him such expenses, nor to take into account the fact that the buyer's default leaves the seller with land that he had contracted to convert into cash—or other property—is to ignore the realities of the situation.

Cross-complainants' major premise—that the damages against Mrs. Barton may be increased by the exact amount of expenses for which they became obligated in connection with the abortive sale to her—is thus directly contradicted by *Royer*. The real significance of such obligations is that Mrs. Barton cannot claim them as a credit against the expenses of a hypothetical resale.

We must now inspect the correctness of cross-complainants' minor premise, that the very recovery of damages for the breach obligated them to pay the commission for the sale to Mrs. Barton.

If cross-complainants are correct, the language in *Royer* concerning the saving of $780 was quite illusory, since by the very act of suing and recovering damages for the buyer's breach, Mrs. Royer precluded any such saving. We cannot assume that our Supreme Court laid down a rule for a situ-

*Freedman* v. *Rector etc. of St. Matthias Parish,* 37 Cal.2d 16 [230 P.2d 629, 31 A.L.R.2d 1], was a case where the resale was at a better price than the original sale. In *Fry* and *Caplan* no broker's fee was involved in the resale. In all three cases it was held that the expenses in connection with the original sale were chargeable to the buyer. These results are not at odds with our view that in a suit for breach of contract by the seller, it is expenses of the second sale which the buyer must pay. Each of the three cases involved an attempt by the defaulting buyer to recover his deposit and, naturally, expenses incurred by the seller had to be deducted. In such a suit the court merely attempts to see that the seller is not worse off than he was *before* he contracted with the buyer. In a seller's suit for damages, on the other hand, the attempt is to put the seller in the position in which he was *after* the contract. (See Rest., Contracts, § 347, com. b.)

[8] Section 3358. "Notwithstanding the provisions of this chapter, no person can recover a greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides, except in the cases specified in the articles on exemplary damages and penal damages, and in sections [3319, 3339, and 3340]."

ation which, in law, cannot occur; nor can we say that the rule is limited to the facts in *Royer* because there it just might have been the case—the opinion is silent on the point—that the broker had relinquished any right to the full commission he would have earned under the theory advanced by cross-complainants here. If that had been the case, the court would surely have circumscribed its holding.

Nor may we assume that the court impliedly held that by accepting about half of the buyer's deposit the broker had waived any additional right to a commission which might be coming to him under cross-complainants' theory. Such an implied holding would have been peculiarly inappropriate in a case which also held that the seller's retention of the deposit was not inconsistent with her right to damages.

There is of course a great deal of plausibility to the *Lesser* theory that the seller should not be able to enforce the contract and retain for himself what he would have had to pay the broker, had the buyer performed. This reasoning, however, becomes untenable once it is the law that an expense which the seller did not incur because of the default is precisely what he does not recover when he sues for damages. *Lesser* and *Royer* simply cannot coexist in the same jurisdiction.[9]

The judgment below must therefore be reversed for two reasons:

1. The trial court never determined the expenses, including but not limited to a commission, which would have been incurred in connection with a hypothetical resale at the market value at the time of the breach; and

2. The trial court assumed as a matter of course that by suing and recovering damages for Mrs. Barton's breach, and for no other reason, the owners made themselves liable to the brokers for the commission.

At a retrial, under proper amended pleadings, the trial court will, of course, not be precluded from determining whether the brokers had otherwise earned their commission at

---

[9]We have, throughout this opinion, treated *Lesser* the way counsel for cross-complainants would have us do, namely as actually holding that by a successful suit for damages the owner makes himself liable for an otherwise unearned commission. In truth such a supposed rule was merely the basis for the court's reasoning that when the seller and the defaulting buyer get together and settle for an amount greater than the commission, the seller cannot keep all the proceeds of the settlement. Nothing in this opinion must be construed as holding that if the precise facts of *Lesser* again come before a court a different result should follow. It is evident that reasoning entirely different from that employed by the *Lesser* court can justify the result of that case.

the time of the breach, a fact which would preclude any credit against the judgment. There is no need to retry the issues of breach, the difference between the purchase price and the market value and any questions in connection with expenses other than the commission. (See *Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 801-803 [197 P.2d 713].)

We now turn to the problems posed by White Oak's dual capacity as an owner and as a broker. At the retrial the question will arise to what extent, if any, the 40 percent of the commission payable to White Oak should figure in the application of the *Royer* formula. The record, which contains a directive by White Oak to the escrow holder instructing it to credit both White Oak and the Coffins with the full amount of the commission due White Oak ($4,788), strongly suggests that the owners were merely using White Oak's license as a device to hold Showcase's commission down to 60 percent of 6 percent, or 3.6 percent. Counsel for cross-complainants suggests that the record is not conclusive in that respect and he may be right. It is immaterial. Whether or not, as between the Coffins and White Oak, White Oak did earn or would have earned a larger share of the proceeds of the sale than it had coming merely by virtue of being a co-tenant, is strictly a matter of accounting between it and the Coffins.

The fact is, that White Oak's 40 percent of the commission will be an irrelevant factor at the retrial. If, at such trial, the court should find that at the time of the breach the commission had been earned, no question of any credit in favor of Mrs. Barton can arise. It simply is none of her business how the sellers and the brokers adjust their obligations. If, on the other hand, it should be found that the commission had not been earned, the maximum credit to which she will be entitled is that portion of the commission which would have been paid to Showcase—3.6 percent. If she were allowed more, she would be getting a credit for an expense which the owners did not, in fact, save.[10]

---

[10]This would be true whether or not, as between White Oak and the Coffins, White Oak would have been permitted to retain its 40 percent out of the proceeds of the sale to Mrs. Barton. Suppose A and B own a piece of real estate. B is a licensed broker. They sell it to D for $200,000. It is agreed that R, another broker, is to get 50 percent of the total commission of $10,000. A and B agree that B is to keep the other 50 percent as compensation for his professional efforts in finding a buyer. If that deal goes through, the proceeds will be distributed as follows: A—$95,000; B—$100,000; R—$5,000. The net proceeds to A and B would be $195,000. If the buyer defaults and the hypothetical resale is for $180,000, A and B will have to pay a new commission. At 5 percent this would be $9,000. The sellers would then get $171,000 as the net

The judgment is reversed insofar as it decrees the recovery $7,182 plus interest by the cross-complainant Showcase Properties, Inc., and $4,788 plus interest by the cross-complainant White Oak Realty, Inc. and the trial court is directed to retry the issue of brokers' commissions in accordance with the views herein expressed. In all other respects the judgment is affirmed. Each side is to bear its own costs on this appeal.

Stephens, J., and Reppy, J., concurred.

proceeds from the resale. In a suit against the buyer, they would be entitled to $20,000 in damages pursuant to section 3307 of the Civil Code, plus $9,000, the new commission, representing the expense of resale. Their gross proceeds from the resale and the damage award would then be $200,000. Against this the defaulting buyer may legitimately be allowed a credit of $5,000, R's unearned commission. If the credit is $10,000, the net proceeds would only be $190,000, $5,000 less than the net proceeds from the first sale would have been. Whether or not, as betwen A and B, B is entitled to $5,000 "off the top," is strictly a matter of adjustment between them. It is, of course, possible that the buyer may be able to prove that because of B's status as a broker, the commission in connection with the hypothetical resale would be less than $9,000. Such proof, however, would only affect the gross damage award, not the credit against it.