[Civ. No. 32245. Second Dist., Div. Five. Jan. 23, 1970.]

CHARLES R. ABRAMS, JR., Plaintiff and Respondent, v.
JOHN BARROW MOTTER, Defendant and Appellant.

**COUNSEL**

Irmas & Rutter, Irmas, Simke, Rutter, Green, Lasher & Hecht, Lillian Finan, Sidney M. Irmas, David Manning Chodos and William A. Rutter for Defendant and Appellant.

Sheppard, Mullin, Richter & Hampton, John A. Sturgeon and William M. Burke for Plaintiff and Respondent.

**OPINION**

**REPPY, J.**—In a nonjury trial of an action brought by plaintiff and respondent Abrams as intended seller of a luxury residence, fully furnished, located on Angelo Drive in the City of Los Angeles (hereinafter "Angelo residence"), for breach of contract by defendant and appellant Motter as intended buyer, the trial court, on April 27, 1967, rendered judgment in favor of Abrams for his loss of bargain damages, for interest on the full purchase price (less existing encumbrance) from date of breach to date of resale, for interest on the loss of bargain damages from date of resale to date of judgment, for expenses incurred in connection with the aborted sale, and for costs of maintenance, taxes, insurance, and interest on existing encumbrance paid with respect to the Angelo residence during the period from date of breach to date of resale.

## I. *The Facts*

A general summary of the facts, consistent with the meaningful findings, but with some details withheld for presentation in connection with coverage of points on appeal, is as follows:

In October 1964, by means of a deposit receipt and escrow instructions, the parties entered into a contract for the sale and purchase of the Angelo residence. The purchase price for the house and lot was set at $205,000, of which $160,000 was to be cash to Abrams and $45,000 was to be included in a promissory note secured by a deed of trust second to the first deed of trust which would secure the sum expected to be borrowed by Motter to make up the major portion of the cash payment. The purchase price for the furnishings was set at $35,000 of which $15,000 was to be cash and $20,000 was to be included in a promissory note secured by a chattel mortgage. The contract contained the following mutually recognized condition precedent: "Subject to Buyer obtaining at least a $100,000 first trust deed loan with interest not to exceed 6¾ %, payable not more than $649.00 per month including interest, at Buyer's expense." The escrow was to close January 13, 1965.

In the negotiations the brokerage firm of Coldwell, Banker and Company, acting through a Mr. Erwin as salesman, was primary broker for Abrams. Motter made as his agent to secure a loan within the terms of the agreement a Mr. Levine, a broker who, though not formally acting as a purchaser's broker for Motter, had brought him to the attention of Abrams as a prospective purchaser and who, for purposes of sharing in the commission to be paid by Abrams, became cooperating broker with Coldwell, Banker. Motter relied entirely on Levine to find a loan. He did nothing on his own.

Levine, in carrying out his undertaking to secure a loan for Motter, feeling that such a person would be most familiar with the money market and would provide wide exposure, got in touch with a Mr. Keppel, an experienced loan broker, connected with General Mortgage and Investment Company. Keppel discussed loan possibilities with about 15 lending institutions, some being savings and loan associations and others insurance companies, including some represented by his company. He was of the opinion that, out of about 300 lending institutions in the serving area, perhaps 50 would loan over $50,000; that the 15 he talked to had the capability of making the loan called for in the Abrams-Motter agreement, although five probably had an automatic policy not to make a loan of this type. He obtained one *provisional* commitment (no commitment could be considered *firm* until a formal written application was presented by the intended borrower and was passed on by the institution's loan committee),

but it had higher monthly payments than specified in the condition precedent ($676 as against $649). He reported this to Levine. Keppel then stopped seeking a loan because he became of the opinion that no lending institution would make the loan called for in the agreement. He felt that the reason was that the Angelo residence had an inadequate value for loan purposes and had a very narrow access to the public street.

Erwin advised Levine that several loan companies were interested in considering an application from Motter. He named Home Savings and Loan Association (hereinafter, Home) and Southern California Savings and Loan Association (hereinafter, So. Cal.).[1] A representative of So. Cal. had seen the property. Erwin told Levine that Home and So. Cal. would consider making loans in the amount of $100,000 with interest varying from 6.6 percent to 6.75 percent for 30 years, although the So. Cal. representative had spoken of 7 percent, possibly 6.75 percent for 30 years. The representative from So. Cal. telephoned Levine and indicated that So. Cal. possibly was interested in making a loan of the desired specifications. So. Cal. did not furnish an application form to Levine. Although not precluded from doing so, Levine did not go to So. Cal.'s office to get an application form because, in his belief, such action on the part of a prospective borrower was not customary. His experience had been that lenders sent applications to him.

Soon after the opening of the escrow, the representative from Home telephoned Levine and discussed the terms of a loan. This resulted in Home sending Levine a loan application form filled out to show $100,000, 30 years, 6.6 percent interest, and monthly payments of $639.[2] When he first received the provisional commitment from Home, Levine advised Motter that he had a provisional loan commitment and was working on others. He did not, however, mention that the provisional commitment was from Home. In mid-December of 1964, after he considered that he had exhausted his source of financing through Keppel, Levine advised Motter that the only provisional loan commitment he had meeting the condition precedent was from Home. Motter would not and did not execute Home's application form for submission to it. He gave as his reasons to Levine that he did not particularly care to do business with Home because of its harsh prepayment penalty which he had learned about when trying to refinance his own house; that he did not like Home; that he had had difficulty with "them." He told

---

[1] Atlantic Savings and Loan Association had previously made a loan to Motter on an apartment building. The record does not disclose whether it was or was not one of the facilities contacted by Keppel. It was never contended by Abrams that any failure to contact Atlantic showed lack of due diligence on the part of Motter.

[2] The application called for "2 points" to Home for making the loan; this was never raised as a problem. The agreement said obtaining the loan was to be at Motter's expense.

Levine that he was not going to acquire the Angelo residence. Levine asked Motter what were they going to do with the contract, and he replied that he had best contact an attorney; that he was dissatisfied with the loan. At trial Motter, when testifying, gave as his reasons for declining to submit an application to Home that it had a "heavy penalty payoff"; that it had refused to increase the loan on his house more than $6,000 or $7,000 when he had wanted to build a swimming pool at a cost of $10,000; that he "just plain . . . [did not] like doing business with them at all"; that all of his "business dealings with them . . . [had] been bad."

On January 6, 1965, the attorney for Motter advised Abrams that he was not going to buy the Angelo residence because he could not get financing.

In the meantime, relying on his anticipation that the purchase and sale agreement would be consummated,[3] Abrams purchased another, somewhat less luxurious, residence on Thrasher Avenue (hereinafter "Thrasher residence").

Upon receipt of Motter's withdrawal communication, Abrams advised Motter that he would consider the escrow open until January 13, 1965. After that date Abrams relisted the Angelo residence with Coldwell, Banker and filed suit against Motter with a first cause of action for specific performance and a second cause of action for damages.

In the meanwhile Erwin continued to act for Coldwell, Banker. He advertised the Angelo residence weekly in the Los Angeles Times, showed it, cooperated with other brokers in the area, and exposed it to the general market as often as possible.

Abrams continued to live in the Angelo residence so as to maintain it in good condition to facilitate its resale and to guard its furnishings. By doing this he also, of course, enjoyed its accommodations. He incurred expenses in keeping up the house, the grounds and the pool, and he paid taxes, insurance and interest on the existing encumbrance. He kept the Thrasher residence unfurnished and vacant, not knowing when he might resell the Angelo residence.

On November 8, 1965, a sale of the Angelo residence with carpets and drapes for $165,000, worked out by Erwin, was consummated. At that time, and shortly thereafter, Abrams, through miscellaneous transactions,

---

[3]There was no evidence or finding that Levine or Motter assured Abrams that the deal was going through. Abrams did not testify that he knew about Home's provisional commitment. Perhaps it was inferable that Erwin had told him and that Abrams assumed that Motter would be willing to process the application and that Home would grant it.

sold the other furnishings (except for two fireplace fenders, valued at $300 for both, which he kept) for $20,068. He incurred a termite charge and presumably an escrow fee, and he paid Coldwell, Banker a commission on the sale. That firm had not charged a commission on the aborted first sale. Levine sued Abrams for his part of the commission on the aborted first sale, $6,000. A settlement was reached. The evidence about it is so vague that we are unable to characterize it.

## II. *The Contentions*

In effect, Motter contends: (1) That the trial court erred by placing upon him the burden of proving by a preponderance of the evidence that he had exercised good faith and used due diligence[4] to obtain the first trust deed loan, an implied covenant of the purchase and sale agreement, and that Abrams' evidence on this point was inadmissible or insubstantial; (2) that the trial court failed to make a finding on the material issue raised by Motter of whether he actually could not have got a loan within the prescription of the agreement even if he had exercised due diligence, that, in the determination of this issue, the burden of proof should be on Abrams, and that, in any event, his (Motter's) evidence showed nonavailability of such a loan as a matter of law; (3) that the trial court erred in computing loss of bargain damages by allowing Abrams' real-estate-appraisal witness to use post breach date factors to determine the fair market value of the Angelo residence as of the date of breach; (4) that the trial court erred in awarding (a) as part of loss of bargain damages, prejudgment interest on the principal amount thereof; (b) as consequential damages, the loss of earning power (measured by interest) of the purchase price of the Angelo residence less its current encumbrance, for the period from the date of breach to the date of the resale; (c) as further consequential damages, taxes, insurance, interest on existing encumbrance, and maintenance on the Angelo residence without offset for value of use; and (d) as further consequential damages, the particular amount specified for brokers' commissions and termite work with respect to the resale.

## III. *Discussion*

### A. *Burden of Proof as to Due Diligence to Obtain Financing and as to Nonavailability Thereof.*

■ With the execution of the agreement there came into being an implied covenant obligating Motter to use due diligence to obtain the proposed financing. (*Bewick* v. *Mecham,* 26 Cal.2d 92, 99 [156 P.2d 757, 157 A.L.R. 1277]; *Fry* v. *George Elkins Co.,* 162 Cal.App.2d 256, 261

---

[4]Hereinafter the single term "due diligence" will be used to cover both concepts.

[327 P.2d 905]; see *Harm* v. *Frasher,* 181 Cal.App.2d 405, 417 [5 Cal. Rptr. 367].)

Where the alleged breach by a contracting buyer, which the contracting seller contends entitles him to damages, is the former's failure to carry out his promise (express or implied) to use due diligence to obtain a loan, the securing of which is set up as a condition precedent to the buyer's obligation to purchase, the burden should be on the seller to "persuade"[5] by a preponderance of the evidence that the buyer did not use due diligence in that regard. Although the issue of burden of proof does not appear to have been specifically litigated in *Fry* v. *George Elkins Co., supra,* the principle just set out by us can be drawn from the discussion in that case. Although in *Fry* it was the party who contracted to buy who brought suit to recover some initial payments made toward the aborted purchase, it is clear that it was necessary for the party who contracted to sell to show that the intended buyer had breached his obligation to use due diligence to secure a refinancing loan so as to establish his right to have set off against the restitution going to the buyer what would have amounted to his consequential damage (brokerage commission and legal fee incurred on a resale and value of certain personal property thrown in to clinch the deal) had he brought suit.

Motter's alleged failure to use due diligence to get the desired loan is the true breach of obligation upon which Abrams bases his claim for damages. (Cf. *Bewick* v. *Mecham, supra,* 26 Cal.2d 92, 99.) Therefore, it is an essential element to his claim for relief. This places the burden of persuasion upon Abrams. (Evid. Code, § 500; Witkin, Cal. Evidence (2d ed. 1966) Burden of Proof and Presumptions, § 197, p. 180.) This is true even though in one sense it means proving a negative (that Motter did not use due diligence (Witkin, Cal. Evidence (2d ed. 1966) Burden of Proof and Presumptions, § 197, p. 181)), and even though Motter, in a so-called cross-complaint for declaratory relief, alleged that there was a dispute over whether he had used due diligence and asked for a judicial declaration that he had.

At the conclusion of the taking of evidence on the issue of due diligence by Motter, which the parties had stipulated should be tried first, the trial court said, "[S]ince the defendant [Motter] has the burden, [he] should open and close the argument." ■ Placing the burden on Motter of proving by a preponderance of the evidence that he had used due diligence was error. It was highly disputed how Motter's varying reasons for not wanting to deal with ·Home (particularly whether its prepayment penalty was

---

[5]Witkin, Cal. Evidence (2d ed. 1966) Burden of Proof and Presumptions, § 194, pp. 178-179.

reasonable or unreasonable) and how Levine's reason for not taking the initiative to get an application form from So. Cal. should be classified within the concepts of due diligence. We cannot tell in what manner the trial judge might have reacted to the contentions and proofs if he had operated from the premise that the burden of persuasion was on Abrams.[6]

█ When the buyer concedes, or lets it be assumed for the sake of presenting all possible defenses, that he did not use due diligence to secure a loan, and urges, affirmatively, that even if he had used due diligence, he could not have obtained the prescribed loan, the burden is upon the buyer to establish this by a preponderance of the evidence. There seems to be no direct California precedent on this point. However, the concept can be gleaned from *Johnson* v. *Hapke,* 183 Cal.App.2d 255, 259 [6 Cal.Rptr. 603]. There a seller of a house agreed to move by a specified date if it were possible. The buyer sued because the seller failed to do so. It seems to be assumed that the seller had failed to perform an implied agreement to use due diligence to obtain other lodgings and that the seller, in effect, was saying that even if he had used due diligence, it would have been impossible for him to have found other housing. It was held that the buyer did not have to plead (and so prove) that it was possible for the seller to vacate by the specified date. "There was a collateral duty upon [the seller] to bring about the happening of the event of vacating the premises . . . . The burden was upon [the seller] to show any reason as to why it was impossible to vacate on or before the agreed date." (183 Cal.App.2d at p. 259.) The issue of impossibility was raised as an affirmative defense in Motter's answer. The burden of proving the defense of impossibility is on the party asserting it. (Evid. Code, § 500; *Hensler* v. *City of Los Angeles,* 124 Cal. App.2d 71, 83 [268 P.2d 12].)

Nothing in the record shows that the trial judge addressed himself to the question of whether any of Motter's proof established by a preponderance of the evidence that even if he had carried through the effort to get a loan of the prescribed terms from Home or So. Cal. he would not have been successful. █ There is evidence in the record which bears on the point.[7] Keppel testified that other lending institutions which normally would have made a loan of this nature on a luxury residence would not do so as to the Angelo residence. Also, Keppel expressed the individual opinion, as an expert in the financing field, that a loan of the dimensions required under

---

[6]It might be suggested that Motter had invited the error by filing his cross-complaint, agreeing to the initial trial of what was denominated his affirmative defense, and assuming the burden of producing evidence. However, we feel that Motter only cooperated in setting up an order of proof for court efficiency and only acquiesced in a partial modification of the burden of going forward with evidence.

[7]Although it may have been adduced as bearing on the issue of Motter's due diligence, it applied also to the question of impossibility.

the contract could not be obtained on the Abrams property because of its narrow access to the public street and its inadequate value for loan purposes. These items are circumstantial evidence of the reasonable probability that a loan of the prescribed terms could not have been negotiated with So. Cal. or Home. There was little qualified evidence on the opposite side. The documentary evidence consisting of the application form presented by Home to Levine partially filled out by it and the testimonial evidence that So. Cal. had made an inspection and had one of its representatives contact Levine would seem to be of some probative value in this area. However, the testimony of Erwin as to what the Home representative told him about Home's intentions properly was not used for the purpose of proving the truth of such representations.

Because of the absence of a finding of fact among the extensive findings and of any other indication in the record with respect to this facet of the case, it cannot be assumed simply from the judgment that the issue was met and that an implied finding adverse to Motter exists.

Failure to make such a finding on such a material issue is reversible error. (*Fairchild* v. *Raines,* 24 Cal.2d 818, 830 [151 P.2d 260]; *San Jose etc. Title Ins. Co.* v. *Elliott,* 108 Cal.App.2d 793, 801 [240 P.2d 41].)

B. *Damage Issues.*

In order to preclude the possibility that at retrial errors might be made on the issue of damages (as some were in the trial under review), we discuss that phase of the case and set out some guideposts.

1. *Loss of Bargain Damages.*

The trial court used the correct legal formula to measure the loss of bargain damages as to the real property, i.e., the excess of the contract price over the value of the real property to the seller at the date of breach. (Civ. Code, § 3307; *Royer* v. *Carter,* 37 Cal.2d 544 [233 P.2d 539].)[8] However, an uncertainty is inherent in the fact criteria as presented which if resolved one way would create error. It is generally accepted that the equivalent of value to the seller is fair market value. (*Royer* v. *Carter,*

---

[8]There may be some question as to whether the same measure for loss of bargain damages should be applied to personal property when it is sold as a unit with real property; however, for all practical purposes, the court, with concurrence of respective counsel, applied the regular standard (excess of contract price over resale price (Civ. Code, § 3353)). This seems reasonable since a major portion of the furnishings was disposed of in separate, miscellaneous sales. Part of the furnishings (carpets and drapes) were resold with the Angelo residence. Two fireplace fenders, having a combined value of $300, were retained by Abrams. Counsel are agreed that the combined disposals brought Abrams just about the sales price allocated to the personal property, and that, therefore, there were no loss of bargain damages as to the personalty.

*supra,* at p. 550; *Employees' Participating Assn.* v. *Pine,* 91 Cal.App.2d 299, 301 [204 P.2d 965].) Fair market value is reckoned "in terms of money." (*Sacramento etc. R. R. Co.* v. *Heilbron,* 156 Cal. 408, 409 [104 P. 979].) The court in *Heilbron* said that a jury instruction which referred to cash was correct. Article XI, section 12 of the California Constitution requires assessment for taxation at cash value. *Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 623 [184 P.2d 879], holds that for purposes of taxation the cash value of property means its fair market value. Appraisers do not always make this distinction, particularly when comparing sale prices of comparable property. We do not know if the appraisal evidence was given on this basis. Therefore, if the issue of loss of bargain damages is relitigated, the market value on the date of breach should be estimated on an all-cash-to-seller basis. To be fair to Motter, in measuring loss of bargain damages, equivalents should be compared. Since by legal definition the date of breach standard is one based on an all-cash concept, the equivalents should be cash to cash, and this requires converting the contract price from its part-term basis to a full cash one. (Cf. *Riley* v. *District of Columbia Redevelopment Land Agency* (1957) 246 F.2d 641 [100 App. D.C. 360].) What figure will be arrived at will depend on evidence at retrial relating to this feature. ■ Generally (but probably not always) a discount of the promissory note involved is in order, based on various factors, including but not limited to the value of the real property securing the note (cf. *Harold* v. *Pugh,* 174 Cal.App.2d 603 [345 P.2d 112]), the amount of prior encumbrances (cf. *Harold* v. *Pugh, supra*), the terms of the note (cf. *Chesapeake & Ohio R. R.* v. *Kelly,* 241 U.S. 485 [60 L.Ed. 1117, 36 S.Ct. 630]), risk of economic changes during the term of the note, risk of expense of foreclosure and risk of change in interest rates.

■ Motter argues that the appraiser's concept of economic obsolescence[9] (depression of value due to dissemination of information about the broken contract) is invalid because it evolves from post breach circumstances. However, the viewpoint that this effect can be anticipated in advance is not unreasonable. The concept is recognized in *Bouchard* v. *Orange,* 177 Cal.App.2d 521, 525-526 [2 Cal.Rptr. 388]. (See also Hetland, *The California Land Contract* (1960) 48 Cal.L.Rev. 729, 756.)

## 2. *Interest on Loss of Bargain Damages.*

The trial judge apparently considered that loss of bargain damages ($35,000) (although derived from the subtraction of the fair market value as of date of breach, rather than of the price obtained at later resale, from the contract price) eventuated at date of resale (November 8, 1965), and he awarded interest on that damage element from that date. This action

---

[9] Erwin alluded to this same concept in his testimony.

was contrary to the damage concept of Civil Code section 3307 as explained in *Royer* v. *Carter, supra,* 37 Cal.2d 544. ■ When a seller, in face of the buyer's refusal to purchase, ultimately seeks damages only, he relieves the buyer of his obligation, and the law substitutes for the seller's rights under the contract (1) the property free of the buyer's right to purchase, and (2) the loss of bargain damages. Therefore, if interest were to be allowed on loss of bargain damages, it should run from the date of breach. The question remains, however, whether such prejudgment interest on loss of bargain damages can be recovered at all in light of Civil Code section 3287 and decisions interpreting it. Section 3287 reads in part as follows: "Every person who is entitled to recover damages . . . capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day. . . ."

The logical point of commencement for analysis of this provocative issue is the decision in *Lineman* v. *Schmid,* 32 Cal.2d 204 [195 P.2d 408, 4 A.L.R.2d 1380], decided in 1948. It is obvious that in the course of preparing its opinion the Supreme Court examined all the preceding cases dealing with this issue. It reviews most of them, no doubt cites all of them, quotes section 337(a) of the Restatement of the Law of Contracts, and distills from them this general rule: "[I]nterest is not allowable when damages cannot be computed *except on conflicting evidence,* such as in the present case, *because of the absence of* established or *reasonably ascertainable market prices* or *values."* (Italics added.) (32 Cal.2d at p. 212.) *Lineman* involved baking flour of a unique variety as to which the market quotations for common brands of flour provided no index of value. The Supreme Court's mention of "conflicting evidence, such as in the present case" had reference to testimony and documents which dealt with such factors as costs of production, carrying charges and profits from which the value of the unique product could be estimated. (32 Cal.2d at p. 213.)

The cases since *Lineman,* which apply its general principle to situations where the *value of real property* was a factor in reaching a damage figure on which the allowance of prejudgment interest was in dispute, are not in uniform array. What apparently was the last word prior to *Lineman* as to this type of case wherein realty value was involved is found in *Katz* v. *Enos,* 68 Cal.App.2d 266 [156 P.2d 461], decided in 1945. A judgment allowing interest on damages measured by the value of land which had been wrongfully appropriated and sold was upheld on the basis that the demand (value of the land) could be determined by reference to well established market values. Presumably the court felt that this was the situation with respect to realty. ■ It is noted, however, that generally California does not allow the fair market value of real property to be proved by the direct

presentation of comparable sales to the fact-finder. It is established by expert or owner appraisal opinions which are supported or tested by examination of comparable sales. (Witkin, Cal. Evidence (2d ed. 1966) Circumstantial Evidence, § 363, p. 322; The Opinion Rule, § 423, pp. 381-383.) However, in some cases, where neither side produced expert opinion, appellate courts (perhaps to save retrial) have stated that the resale price of the property itself is some evidence of its fair market value at the date of breach. (See, e.g., *Howe* v. *City Title Ins. Co.*, 255 Cal.App.2d 85, 88 [63 Cal.Rptr. 119].)

The first post-*Lineman* real property case of significance[10] is *Boshes* v. *Miller* (1953) 119 Cal.App.2d 332 [259 P.2d 447], relied upon substantially by Motter. Defendant seller, in bad faith, prevented plaintiff buyer from getting his purchase price into escrow on time, and, on this basis, refused to sell. Under the circumstances this was a breach. Under Civil Code section 3306 plaintiff buyer was entitled to recover the difference between the agreed price and the fair market value of the property at the time of breach. The trial court gave judgment for this amount, plus interest. The appellate court reversed as to the interest. The primary basis of its ruling appears to be that section 3306 specifically provides that interest should be awarded as to other elements of damage such as title and preparation of document expenses but not as to loss of bargain damages. The Court of Appeal reasoned that the legislators did not make provision for pre-judgment interest to be awarded as to the latter because the amount of such loss of bargain damages would be subject to conflicting proof.

Two Supreme Court cases followed.[11] The first is *Coughlin* v. *Blair* (1953) 41 Cal.2d 587 [262 P.2d 305]. The seller breached his agreement to bring pavement and utilities to the property. The buyer, who had bought with the intention of building, was given judgment for the difference between what was the value of the realty without these offsite improvements and what would have been its value with them. The difference was $9,500 and

[10]An earlier case, but one wherein the issue was not truly in focus, is *Employees' Participating Assn.* v. *Pine, supra,* 91 Cal.App.2d 299. The trial judge found that a figure somewhat different than that given in the expert testimony was the fair market value of the involved parcel on the date of breach and used it to compute the amount of damages put into the judgment. The appellate report specifies the amount of the judgment. It does not recite any prejudgment interest. There is no indication whether it was asked for. Apparently no issue about such interest was raised on appeal.

[11]An intervening decision did not bear significantly on the problem. It is *Pasteur Realty Corp.* v. *La Fleur* (1957) 154 Cal.App.2d 5 [315 P.2d 374]. There the buyer was allowed recovery of his substantial down payment less the seller's loss of bargain damages measured by the difference between what the opinion described as "true value" and the contract price. Presumably the trial judge did not add interest to the damage figure, and the issue was not raised on appeal.

was derived from the testimony of valuation experts, presumably opinions supported by sale data as to comparable properties. The buyer was also awarded damages for loss of use and increased cost of construction which occurred during the delay period. The Supreme Court holds that there could be no prejudgment interest on the loss-of-use and increased-costs damages because they were subject to proof by conflicting evidence. However, as to loss of bargain damages, the Supreme Court, at the end of the opinion, with no explanatory comment, states: "To the extent . . . it awards $9500 general damages *with interest thereon* and costs, the judgment is affirmed." (Italics added.)(41 Cal.2d at p. 607.) Thus, this decision has direct, but not pointed, bearing on the issue. It suggests that realty value can be found with sufficient accuracy from market information to make interest on damages dependent upon such value allowable.

The second Supreme Court case is *Caplan v. Schroeder* (1961) 56 Cal.2d 515 [15 Cal.Rptr. 145, 364 P.2d 321]. A breaching buyer was found entitled to restitution of his down payment less the seller's damages. The trial court awarded interest on the restitution only from the date the action was brought—January 24, 1958. Buyer contended on appeal that it should run from the earlier time when the escrow was terminated which he urged was when his right to restitution became fixed. On October 16, 1958, before the trial, the parties had stipulated that at all material times the fair market value was equal to the contract price. The Supreme Court held that not only was the buyer's claimed interest date wrong but so was the trial court's, saying: "Since the value of the property on which the extent of damages depended (see Civ. Code, § 3307) was not certain and could not be made certain by calculation [citations], interest did not become payable until the parties stipulated to that value. . . ." (56 Cal.2d at p. 521.) The indication of this language is that the Supreme Court felt that the value of real property could not be determined with sufficient accuracy from market information so that prejudgment interest could be awarded under the *Lineman* formula. Thus, it did not allow interest either from the commencement date utilized by the trial court or from the date argued for by the buyer, but only from the date of the stipulation as to value (which made it certain).

Two Court of Appeal cases have come down since *Caplan*.[12]

---

[12]A more recent Supreme Court case, *City of Salinas* v. *Souza & McCue Constr. Co.* (1967) 66 Cal.2d 217 [57 Cal.Rptr. 337, 424 P.2d 921], does not deal with interest on damages computed from real property valuations. Rather the damages were derived from the difference it cost the construction company to do a job for the city with certain unanticipated soil conditions present as against what it would have cost absent the soil difficulties. In holding that prejudgment interest was not recoverable because the amount of damages could not be ascertained except on conflicting evidence, the Supreme Court cited *Lineman* and *Coughlin*. No doubt the latter was

In *Howe* v. *City Title Ins. Co., supra,* 255 Cal.App.2d 85, it was determined that a parcel of real property had sufficient value so that a junior mortgagee could recover the full value of his security from the title company which was liable to him because it had neglected to record a notice of default as to the junior encumbrance. The title company claimed that the trial court erred in awarding prejudgment interest on this amount because it depended on the value of the real property. Damages would have been less if the value of the real property had not been sufficient to cover both encumbrances. The Court of Appeal sustained the trial court, saying (at p. 88): "It is the rule that if damages may be determined by reference to reasonably ascertainable market values, they are 'capable of being made certain by calculation' . . .", and citing *Lineman.* Evidence of "reasonably ascertainable market values" was said to be the amounts derived from a prior sale of the subject property and from the sale under the first trust deed.

The final real property case we have located (and the most recent in point of time) is *Ruth* v. *Lytton Sav. & Loan Assn.* (1968) 266 Cal.App.2d 831 [72 Cal.Rptr. 521]. Here City Title Company (against whom judgment went) failed to record the beneficiary-plaintiffs' deed of trust ahead of Lytton's major financing encumbrance. Reasoning that if Lytton had known of a prior deed of trust it would not have financed, and plaintiffs would have retained the property, the Court of Appeal held that the value of the property was the plaintiffs' measure of damages. It said that the resale of the land had established its value, which sum, less a cash amount plaintiffs already had received, was their measure of damages. It directed the trial court to "enter judgment in favor of plaintiffs . . . [in that amount], for interest thereon, and for reasonable attorney fees." (266 Cal.App.2d at pp. 845-846.) It did not say from what date interest was to be computed. Presumably it would be from the date when the title company's dereliction made plaintiffs' security worthless. Evidently the Court of Appeal accepted the concept that the market value of the realty was adequately calculable by reference to its resale price.

It is to be noted that in the last two cases the Court of Appeal was dealing with the situation where both parties permitted the only source of information as to the fair market value of the involved real property to be its own prior sale or resale price. This may have influenced these benches, although theoretically it should not have.

When a reason is given for the certainty-by-calculation rule, it is, " 'that where the person liable does not know what sum he owes, he cannot be

cited for its treatment of the issue of interest on loss-of-use and increased-building-costs damages. It is felt that this case indicates that the high court's thinking on prejudgment interest in real property cases is stronger for the *Caplan* position than for the *Coughlin* position.

in default for not paying,' " or, " 'that where a defendant does not know what amount he owes and cannot ascertain it except by accord or judicial process, he cannot be in default for not paying it.' " (*West* v. *Holstrom*, 261 Cal.App.2d 89, 96 [67 Cal.Rptr. 831], quoting from *Chase* v. *National Indem. Co.*, 129 Cal.App.2d 853, 865 [278 P.2d 68] and *Conderback, Inc.* v. *Standard Oil Co.*, 239 Cal.App.2d 664, 689-690 [48 Cal.Rptr. 901].) The omitted sequel is that if he is not in default for not paying he should not be subject to the penalty effect of interest. This treatment of the problem from the standpoint of the culpable defaulting party is criticized in a well-reasoned comment in the U.C.L.A. Law Review. (Comment, *Interest as Damages in California* (1958) 5 U.C.L.A. L. Rev. 262, 263-264, 268.) We also note that in cases like ours the breaching buyer does not pay what is likely to be found to be the loss of bargain damages, not because he cannot make a reasonable calculation thereof, but because he believes he is justified in withdrawing from the deal and is not really breaching a contract.

We feel that the apparent conflicting status of the decisions and the questioned soundness of the rationale for the rule warrants a reexamination of the prejudgment interest issue by the Supreme Court in the real property valuation area and by the Legislature in general. However, we must treat with the instant case under the existing posture of the decisions. We believe that *Caplan* is the stronger guide. Moreover, we feel that there are factors present in our case which are akin to the special feature upon which the decision in *Lineman* turned. In *Lineman,* because of the unique nature of the baking flour involved, the prices listed for normal types of flour were not usable. ▮▮▮▮ In our case, although the appraiser-witness checked sales of comparable parcels of real property (and found the price trend was up) their part in his opinion-reaching process was insignificant (if not nonexistent) because the so-called "economic obsolescence" feature was the all-pervading factor supportive of the appraiser's opinion. Thus, a unique circumstance about the property made reference to current market prices of properties, unaffected by such a feature, of little value. They could not be considered as reasonable guides to Motter had he been of a mind to concede liability and pay Abrams' loss of bargain damages. Consequently, assuming the proofs remain the same on retrial, no prejudgment interest on loss of bargain damages should be awarded.

### 3. *Consequential Damages.*

#### a. *Interest on net proceeds.*

The trial court awarded Abrams interest on the total net purchase price.[13]

---

[13]The trial court calculated the net cash amount ($201,545.87) by deducting the outstanding encumbrance on the property from the total purchase price. Because the

The trial court appears to have made such interest award on the theory that but for Motter's breach, Abrams would have had cash available for his use on January 13, 1965; that instead Abrams was forced to retain concededly non-income producing property until such time as he could effect a resale. Such an award necessarily would be based on the recognition that the property could not be resold immediately (assuming that the seller has shown that he still wants to sell it), that it is the buyer's breach that causes the delay in the conversion of the nonproductive real property into at least legal-interest-earning cash, and that the buyer should be held responsible for the loss of earning power of the seller's asset for the period involved. This would be particularly true where the breach itself created a stagnant market condition. Thus, Abrams' counsel argues that such an interest award should be includable within the category of consequential damages.

While Abrams' argument is provocative, we do not believe that the law of this state sanctions such an award.

■ It must be remembered that an equitable exchange takes place whenever a contract to purchase land is formed. At that moment the purchaser becomes the equitable owner of the land and the vendor's interest is in the unpaid purchase price. (Cf. *Elliott* v. *McCombs,* 17 Cal.2d 23, 31 [109 P.2d 329]; *Estate of Reid,* 26 Cal.App.2d 362, 367 [79 P.2d 451].) ■ When a material breach of such a contract occurs, the innocent party has his election between an action at law for damages, an equitable action for specific performance, and an action for rescission of the contract. In the instant case, Abrams' complaint prayed in the alternative for specific performance or damages on the contract.

■ If the disappointed vendor chooses to remain at all times ready to perform and seeks specific performance of the contract, he foregoes his equitable ownership in, and right to possession of, the subject land and elects to retain his interest in the purchase price in accordance with the terms of the contract. ■ A court sitting in such an equity suit, in addition to decreeing specific performance of the terms of the contract, may award damages in the form of interest for any delay in the vendee's performance of his obligation to pay. (Cf. *Ellis* v. *Mihelis,* 60 Cal.2d 206, 219 et seq. [32 Cal.Rptr. 415, 384 P.2d 7]; *Harm* v. *Frasher, supra,* 181 Cal.App.2d 405, 418-419; *Jonas* v. *Leland,* 77 Cal.App.2d 770, 777-778

contract was part cash/part term, Abrams would not have received that total amount when the escrow closed but rather the cash in the escrow ($160,000) plus term payments on the $45,000 deed of trust. However, this error in computation has become irrelevant in view of our handling of this issue (see *infra*).

[176 P.2d 764].[14] There would be no Civil Code section 3287 problem because the sums would be certain.

However, in the instant case, Abrams did not proceed to judgment with the above described remedy. Rather, in due course, he sought damages based on the contract. In doing so, he gave up his interest in the unpaid purchase price and was awarded, in turn, the equitable interest in the land plus damages equal to the difference between the value of the land to him at the date of breach and the contract price (Civ. Code, § 3307). The loss of bargain damages which section 3307 allows are, in their nature, a substitute for requiring the vendee to perform. "Damages are awarded in an action for breach of contract to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been in had the promisor performed the contract." (*Coughlin* v. *Blair, supra,* 41 Cal.2d 587, 603; see also *Royer* v. *Carter, supra,* 37 Cal.2d 544, 550; 5 Corbin on Contracts (1964) § 1002, p. 31; McCormick, Damages (1935) § 137, p. 561.) Thus, if the vendor is not entitled to receive the proceeds provided in the contract, but only a substitute therefor, he cannot be said to have been deprived of the use of those proceeds.[15] It is the conception of the law that the vendor's reacquisition of access to the property, whether such property is productive or nonproductive, together with section 3307 damages, are full compensation for the vendee's breach. (Compare the cases where a seller is deprived of immediate occupancy of real property and this circumstance is held to be a deprivation of use and compensable. (*Honey* v. *Henry's Franchise Leasing Corp.,* 64 Cal.2d 801, 805 [52 Cal.Rptr. 18, 415 P.2d 833]; *Luz* v. *Lopes,* 55 Cal.2d 54, 61 [10 Cal.Rptr. 161, 358 P.2d 289]; *Yocum* v. *Taylor,* 50 Cal.App. 294, 295 [195 P. 62].))

b. *Resale expenses occasioned by breach.*

If Abrams is successful in the retrial, he can be allowed as consequential damages expenses such as escrow fees and broker's commission based on a hypothetical resale at the $170,000 value-to-seller figure, but reduced by any sum saved by not having to pay all or any part of what would have been paid out as such expenses on the projected sale to Motter. (*Royer* v. *Carter, supra,* 37 Cal.2d 544, 551; *Barton* v. *White Oak Realty, Inc.,* 271 Cal.App.2d 579, 585 [76 Cal.Rptr. 587].) With respect to brokers' commission, it appears that Coldwell, Banker did not make any

[14]Disapproved on an unrelated point in *Ellis* v. *Mihelis, supra,* 60 Cal.2d 206, 216.
[15]Abrams clearly was deprived of the use of the money which gave him the benefit of his bargain (Civ. Code, § 3307 damages), but because of Civil Code section 3287 and the uncertainty of the amount of this damage, an interest award is precluded (see discussion, *infra.*)

claim for commission on the first sale so that Abrams did not have to pay Coldwell, Banker any portion of the $6,000 which would have been its part of the total projected commission on that sale. Presumably, the evidence will be the same on a retrial, in which event the hypothetical resale commission, as a damage item, would have to be reduced by this $6,000. The record indicates that Levine brought a court action against Abrams for $6,000, his one-half of the projected commission on the Abrams-Motter transaction, and that this action was settled. The evidence as to what the settlement was, and what its effect might be, is very sketchy. If on retrial the court is going to be asked to determine if any part of an original commission obligation to Levine was saved, it must be furnished with more detailed evidence with respect to the basis of the claim and the nature, extent and reasonableness of the settlement.

 There is considerable confusion in the record as to what payments were made for termite service in order to effect the first sale and in order to effect the second sale. The details can be cleared up at retrial. The proper measure will be what termite expenditures were necessary for the resale less anything which was to be, but was not, paid in connection with the Abrams-Motter sale and was, therefore, saved.

c. *Other consequential damages.*

One basic element of the trial court's damage award which remains to be discussed relates to the expenditures made in maintaining the Angelo property from the date of breach to the date of resale unreduced by the value of use to Abrams.

Before specifically dealing with this issue, some introductory comments are in order. The landmark case considering a vendee's breach of a land sale contract (*Royer* v. *Carter, supra,* 37 Cal.2d 544) makes it clear that Civil Code section 3307 does *not* provide the exclusive measure of damages for the innocent vendor. The Supreme Court in *Royer* (at p. 550) stated that: ". . . the vendee's breach may make it necessary for the vendor to incur *additional expenses* to realize the benefit of his bargain . . . [and] [w]hen such *additional expenses* are the natural consequence of the breach, they may be recovered in addition to those provided for in section 3307." (Italics added.) The *Royer* opinion deals specifically with the expenses which the innocent vendor would incur in a second sale. More recent cases have shed further light on the scope of "additional expenses" which *Royer* sanctioned.

In *Allen* v. *Enomoto,* 228 Cal.App.2d 798, 803-805 [39 Cal.Rptr. 815], the court allowed the vendor's out-of-pocket expenses for fire insurance, mortgage interest and real property taxes on the subject property. The

award was premised on a finding that the vendor had continued diligently to attempt to resell the subject property and that the resale was made within the shortest period of time possible. The unspoken premise of such a holding is that the vendor (who still wishes to sell the property) actually has had to pay out-of-pocket expenses[16] proximately caused by the vendee's breach.

However, the vendor in *Allen* did not occupy the subject property after the vendee's breach and did not enjoy its use. Under circumstances such as found in *Allen* an award of out-of-pocket expenses may be in order. ▮▮ In the instant case Abrams continued to live in the Angelo residence for a dual purpose: (1) To enjoy its use; and (2) to keep it in presentable condition for prospective purchasers and to protect its valuable exterior and interior appointments. This was Abrams' choice. After the breach he sought a damage remedy, regained his equitable interest in the subject property and could utilize it in any way he saw fit. He cannot charge the expenses of normal occupation to the breaching vendee. If, however, at the trial of this matter, Abrams can isolate certain expenses that were unnecessary to such use but were reasonably related to the process of effecting a resale, these may be charged to Motter.[17]

In the instant case Abrams purchased the Thrasher residence before he knew positively that Motter had secured the financing which was a condition precedent to the deal between them. In certain instances expenses directly made in contemplation of and necessarily related to the carrying through of a contract have been allowed as consequential damages. (See, e.g., *McKinley* v. *Lagae, supra,* 207 Cal.App.2d 284, 295 [innocent vendor terminated lease with present tenant when he sold property; tenant removed; vendee breached; vendor awarded rental value from lost lease until resale]; *McCulloch* v. *Liguori,* 88 Cal.App.2d 366, 375 [199 P.2d 25] [innocent lessee ordered equipment for manufacturing use in leased premises; lessor failed to deliver up premises; cost of storing such equipment in an alternative location allowed].) ▮▮ So upon retrial of this matter, the trier of fact must decide the questions whether Abrams' purchase of the Thrasher property was foreseeable[18] and reasonable.[19] If the answers are both affirm-

---

[16]Some cases have gone so far as to sanction as "additional expenses" under the *Royer* formulation the vendor's loss of profits or deprivation of use resulting from the breach. These "additional expenses" were not required to have been "out of pocket." (*Honey* v. *Henry's Franchise Leasing Corp., supra,* 64 Cal.2d 801, 805; *Luz* v. *Lopes, supra,* 55 Cal.2d 54, 61; *McKinley* v. *Lagae,* 207 Cal.App.2d 284, 295 [24 Cal. Rptr. 454].)

[17]See, e.g., discussion on termite expenses, *infra.*

[18]Is it natural to suppose that one who contemplated a completed sale of his current residence will arrange for suitable accommodations to use when he turns over the subject property to its new owner? Compare the trial court's numbered finding "20" in *Sutter* v. *Madrin,* 269 Cal.App.2d 161, 166 [74 Cal.Rptr. 627].

[19]Did he purchase prematurely?

ative, the expenses connected with the Thrasher residence between the time of the breach and the resale of the Angelo residence would be allowable on a showing, as was made in *Allen* v. *Enomoto, supra,* 228 Cal.App.2d 798, 804, that such resale was made in the shortest period of time possible.

The judgment is reversed.

Kaus, P. J., and Aiso, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 19, 1970.