[No. G007940. Fourth Dist., Div. Three. Jan. 15, 1991.]

SURFSIDE COLONY, LTD., Plaintiff and Appellant, v. CALIFORNIA COASTAL COMMISSION, Defendant and Respondent.

**COUNSEL**

Hill, Farrer & Burrill, Jack R. White, Arthur B. Cook and Dean E. Dennis for Plaintiff and Appellant.

Ronald A. Zumbrun and Edward J. Connor, Jr., as Amici Curiae on behalf of Plaintiff and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard M. Frank, Chief Assistant Attorney General, and Steven H. Kaufmann, Deputy Attorney General, for Defendant and Respondent.

Freilich, Stone, Leitner & Carlisle, Katherine E. Stone and Philip A. Seymour as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

SILLS, P. J.— Surfside Colony, Ltd. (Colony) appeals from a judgment of the superior court upholding the decision of the California Coastal Commission (the Commission) requiring Colony to grant public access to its private beach in return for permission to build a revetment.[1] Colony presents two arguments. First, it contends the superior court should have used the "independent judgment test" instead of the "substantial evidence test" in making its decision. Had the superior court done so, it would have had a better chance of convincing the court the public access requirement really was a "taking"[2] of its property

---

[1] A revetment is a kind of built-up embankment or barricade, often made of rock.

[2] The Constitutions of both California and the United States require the government to pay for any private property it "takes." (Cal. Const., art. I, § 19 ["Private property may be taken

without compensation.[3] Second, Colony contends the Commission should not have prevailed even under the "substantial evidence test." It asserts there was no substantial evidence to support the Commission's decision.

We agree with Colony's second argument. Under *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141], there must be a solid connection between the public burden created by coastal construction and the necessity for a public easement. As explained below, there was no substantial evidence of any such connection in this case. We therefore do not need to decide whether the superior court erred by using the wrong test. The public access requirement cannot be upheld regardless of what test the superior court would have used.

FACTS

Surfside Beach lies just north of Sunset Beach and just south of Anaheim Bay in the City of Seal Beach (hereafter sometimes city).[4] In the mid-1940's, the Navy built two jetties on each side of Anaheim Bay. The jetties converge on each other like sides of a triangle which do not quite meet.

The jetties narrow the entrance to Anaheim Bay. They also block the natural southward flow of sand, preventing the replenishment of Surfside Beach. Additionally, they reflect waves coming in from the ocean. These reflected waves strike the beach sideways rather than head on. As a result,

---

or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."]; U.S. Const., 5th Amend. ["nor shall private property be taken for public use, without just compensation"].)

[3] There are two ways a court may review the decision of an administrative agency—either the "substantial evidence test" or the "independent judgment test." (See Code Civ. Proc., § 1094.5, subd. (c).) If the court uses the "substantial evidence test," the chances are greater the agency decision will be upheld. This is because under the substantial evidence test, the court must resolve reasonable doubts in favor of the administrative decision and uphold the decision if there is "any" substantial evidence to support the findings. (See *Smith v. County of Los Angeles* (1989) 211 Cal.App.3d 188, 198 [259 Cal.Rptr. 231]; see also *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514-515 [113 Cal.Rptr. 836, 522 P.2d 12].) Under the independent judgment test, the court would be free to independently weigh the evidence and resolve conflicts against the agency. (See *Cerberonics, Inc.* v. *Unemployment Ins. Appeals Bd.* (1984) 152 Cal.App.3d 172, 175-176 [199 Cal.Rptr. 292].)

[4] In reality, Orange County beaches do not run either north-south or east-west. They run northwest-southeast. This makes describing local landmarks somewhat awkward, and has prompted at least one commentator to satirically suggest the local board of supervisors legislate a 90-degree compass correction. "Instead of setting the clock back or forward we'll turn the compass 90 degrees to the left to align the county with the cosmic order of things. [¶] That will put the ocean to the west and L.A. to the north where they belong. [Fn. omitted.]" (Bedsworth, *Another Modest Proposal* (1989) 31 Orange Co. Law. 6, 7.) (Actually, the compass need be corrected by only about 45 degrees to the left to achieve the desired result.) For purposes of this opinion, we describe Surfside Beach as if it ran north-south.

the reflected waves abnormally erode the beach just south of the southern jetty.

Behind Surfside Beach lies Colony—a private, gated, residential community of about 250 homes. The homes are nestled in a narrow strip about half a mile long between Surfside Beach and Pacific Coast Highway. On the other side of Pacific Coast Highway lie the waters of Anaheim Bay. Colony owns the beach to the boundary line of the ordinary high-water mark as established by an earlier boundary agreement with the State of California. This boundary line extends about 100 feet toward the ocean at the southern end of the community. At the northern end of the community the boundary extends only about 65 feet toward the ocean. ▮ ▮▮▮▮▮▮ The rest of the beach is public property, owned by the State of California.[5]

Because of Surfside Beach's unique erosion problem, the amount of Surfside Beach available for public use tends to diminish over time, though some sand may come back in the summer time when waves tend to be smaller. Accordingly, every six to eight years the Army Corps of Engineers replenishes the sand on the beach at Surfside. This replenishment also helps replace natural erosion occurring at beaches as far south as Newport. If the Army Corps of Engineers does not act quickly enough, or if erosion between replenishments is excessive, the amount of beach available for public use can shrink to nothing. In the mid-1950's erosion was allowed to eat away the beach to the point where Colony houses were lost.

By the early 1980's, erosion once again threatened Colony homes. Waves had formed a vertical scarp 6 to 12 feet in height along 2,000 feet of beach extending south from the Anaheim jetties toward Sunset Beach. By August 1982, only 30 feet of beach remained between the first house on the north side of Colony to the edge of the scarp.

With winter storms coming, Seal Beach officials feared an impending local disaster with certain loss of property and tax revenue. City officials demanded the federal government immediately replenish the beach with sand. The Army Corps of Engineers, however, told the city it would take no action until the first home was lost.

The city declared a state of local emergency. It applied to the Commission for an emergency permit to place sandbags on the beach. The Commission granted the emergency permit.

---

[5] In California, the area seaward of the mean high tide line is public property, even though the rest of the beach may be privately owned. (See *Marks* v. *Whitney* (1971) 6 Cal.3d 251, 257-261 [98 Cal.Rptr. 790, 491 P.2d 374].)

The sandbags afforded only a temporary solution to the problem. The city then applied for an emergency permit to install a rock revetment in front of Colony's beachfront homes. Colony also applied to the Commission for a standard permit to construct a rock revetment on its property. The revetment was to be about 16 feet high and 800 feet long. On November 4, 1982, the Commission issued an emergency permit to allow immediate installation of the revetment. The city built the revetment and Colony's homes were saved.[6]

The Commission proceeded to process the application for the standard permit. Its staff recommended approval, but with four conditions:

—Colony dedicate an easement for public access and passive recreational use along its private beach. (The parties refer to this as a "lateral access" requirement.)

—Colony dedicate an easement for the future construction of a boardwalk to extend the length of the revetment on Colony's side.

—Colony dedicate an easement for pedestrian and bicycle access across its property from Pacific Coast Highway to the beach. (The parties refer to this as a "vertical access" requirement.)

—Colony post conspicuous signs to inform the public of its right to cross the community's property to the beach.

The Commission's staff report relied on several scientific studies on the effects of revetments and seawalls *generally* on coastal erosion.[7] These studies show revetments and seawalls typically exacerbate erosion of the beach in front of them. The beach receives less "nourishment" from the sand behind the structure. This lack of nourishment causes more waves to break on shore. The extra energy of the additional onshore waves tends to scour the sand from the base of the structure. The beach in front becomes steeper and narrower.

On the other hand, one of the studies pointed out beach erosion is often the result of local wave conditions. According to this study, one must have

---

[6] Colony later agreed to reimburse the city for half the cost. The issue of the impact of the public financing of the revetment is not before this court on appeal.

[7] These included Saving the American Beach: A Position Paper by Concerned Coastal Geologists (March 1981); Shore Protection in California (1976), a publication of the state Department of Boating and Waterways; Christiansen, Economic Profiling of Beach fills (1977); Kuhn, Coastal Erosion Along Oceanside Littoral Cell, San Diego County (1981); and Inman, Man's Impact on the California Coastal Zone (undated), prepared for the state Department of Boating and Waterways.

knowledge of the "specific" beach before one can make a "rational" estimate of any erosion problem.[8]

The Commission held public hearings on the revetment application. In support of its application, Colony submitted an expert report asserting the revetment did not exacerbate erosion. In fact, the revetment supposedly mitigated the impact of the reflecting waves on the beach by absorbing wave turbulence. The Commission also considered its staff report and several photographs of the beach after the revetment had already been built. Three of the pictures were taken in January 1983. They showed, according to the testimony of one Commission staff member, a "perched beach"—that is, a beach in an apparently eroded condition. The Commission also saw a picture of the beach in July 1983. The picture showed sand to have come back and covered over the revetment so that it was not then visible. Despite the photographs, and apparently in reliance on the scientific studies, the Commission voted eight to four in favor of the staff report recommendations.[9]

Colony then filed a petition with the superior court for a writ of mandate. Colony asked the court to command the Commission to delete the special conditions it had imposed. The petition charged these conditions amounted to an unconstitutional taking of the Colony's property without payment of compensation.

About five years later, the case came to trial in the superior court. Using the "substantial evidence test" the court determined three of the four special conditions amounted to an unconstitutional taking. These conditions were the installation of the boardwalk, the right of the public to cross Colony from the public highway during daylight hours to get to the beach (vertical access), and the posting of signs advertising that right. The court upheld the condition allowing the public to use the private beach (lateral access).

Colony then filed this appeal, challenging the lateral access condition.

---

[8] Inman, Man's Impact on the California Coastal Zone (undated), prepared for the State Department of Boating and Waterways, at page 17: "No single cause can be attributed to beach erosion in California since it is often a result of localized wave conditions, the resistance of the bedrock, the presence of man made coastal structures, the lack of a sand supply, or a combination of these factors. [¶] As indicated previously, waves supply most of the energy to the coastline and some fraction of this energy is used to transport sediment in the near-shore environment. Thus, one must have a knowledge of the wave climate at a specific problem site before any rational estimate can be made of littoral sand transport."

[9] The Commission voted to make one change in the staff report. This change dropped the requirement Colony allow access across its property from the street during night hours.

DISCUSSION

In *Nollan* v. *California Coastal Comm'n, supra*, 483 U.S. 825, the United States Supreme Court examined the issue of when the requirement of an easement for public access as a condition for a coastal construction permit would amount to a "taking" of private property without compensation. Essentially, the court held there must be a substantial connection, or "nexus" between the public burden created by the construction and the necessity for the easement.[10] Without such a connection, there is an inference the government is simply trying to expropriate property without paying for it.[11]

In *Nollan*, two homeowners owned a beachfront lot. The building on the lot was a small bungalow which had fallen into disrepair. The owners sought to demolish the bungalow and replace it with a three-bedroom house in keeping with the rest of the neighborhood. The Commission, however, would only permit the owners to replace the structure if they granted an easement allowing the public to cross a portion of their property. The owners challenged the Commission's requirement, and the case eventually came before the United States Supreme Court. In a five-to-four decision written by Justice Scalia, the Supreme Court held the lack of "nexus" between the public burden created by the proposed new construction and the condition required by the Commission (allowing the public to pass over the property) meant the Commission was, in effect, taking the homeowner's property without compensation.

---

[10] The strength of the connection required by *Nollan* is not spelled out in so many words, but appears to be at least a substantial one. At 483 U.S. at pages 834-835 [97 L.Ed.2d at pages 687-688] the court indicates the need for a "substantial" connection between the public burden imposed by the proposed construction and the condition imposed by the government: "Our cases have not elaborated on the standards for determining what constitutes a 'legitimate state interest' or *what type of connection between the regulation and the state interest satisfies the requirement that the former 'substantially advance' the latter.* [Fn. omitted.]" (Italics added.)

The footnote in the quoted language confirms the need for a "substantial" connection. The footnote is addressed to Justice Brennan's dissent, and distinguishes between the simple rational basis test appropriate for due process or equal protection analysis and the "substantial advancement" test which is more appropriate in the "takings field." The footnote states:

"Contrary to Justice Brennan's claim [page citation omitted], our opinions do not establish that these standards are the same as those applied to due process or equal protection claims. To the contrary, our verbal formulations in the takings field have generally been quite different. We have required that the regulation 'substantially advance' the 'legitimate state interest' sought to be achieved." (483 U.S. at p. 834, fn. 3 [97 L.Ed.2d at p. 688].)

[11] See 483 U.S. at page 837 [97 L.Ed.2d at page 689]: "Similarly here, the lack of nexus between the condition and the original purpose of the building restriction converts that purpose to something other than what it was. The purpose then becomes, quite simply, the obtaining of an easement to serve some valid governmental purpose, but without payment of compensation.

The Supreme Court noted the proposed new construction did not block access to the publicly owned shoreline or nearby beaches. From this fact the high court reasoned there was some other, more sinister, purpose to the requirement the owners allow the public to cross over their property. This purpose was the obtaining of an easement by the government without paying for it. The court thus concluded requiring relinquishment of the owners' right to exclude others from their private beach as a condition of the proposed construction amounted to virtual extortion. (See 483 U.S. at p. 837 [97 L.Ed.2d at p. 689].)

*Nollan* thus requires a substantial relationship between the public burden posed by proposed construction and conditions imposed by the government to permit that construction. This was also the way the dissent understood the case. Justice Brennan criticized the majority opinion for insisting on a "precise fit" between burden and condition. (483 at p. 847 [97 L.Ed.2d at pp. 695-696].) In this case, the Commission had before it two basic categories of evidence: the expert studies and the photographs. Of the expert studies, only one dealt with Surfside Beach—the one submitted by Colony. That report, of course, does not support the Commission's decision. According to that report, the revetment tends to mitigate erosion at Surfside.[12] Of the remaining studies, none of them show *this* revetment will cause erosion at *this* beach. They either deal with erosion at other beaches with different wave conditions, or with the effects of revetments and other such structures generally. One of those studies even goes so far as to say one cannot make a "rational" estimate of erosion without knowledge of the wave conditions at a "specific problem site."

Nor do the photographs show any erosion being caused by the revetment in this case. At best (from the Commission's point of view), the photographs show a change for the better consistent with seasonal fluctuations. At worst, they are strong evidence the revetment reversed erosion.

The need for "site-specific" evidence appears to be particularly important in this case. Surfside is unusual, if not unique. Most beaches do not have long jetties to their immediate north changing the normal direction of incoming waves.[13]

Revetments and seawalls may have different effects at different beaches. (See *Barrie* v. *California Coastal Com.* (1987) 196 Cal.App.3d 8, 23-24 [241

[12] Even under the substantial evidence test, the court must still examine the "whole record." (Code Civ. Proc., § 1094.5, subd. (c).)

[13] Diagrams attached to the study done by Colony's expert show the effect of the reflected waves on Surfside. The waves appear to have the effect of redistributing sand from the extreme north end of the beach to a "bulge" somewhat farther south, but still at Surfside.

Cal.Rptr. 477] ["The Homeowners have not established that the two beaches are identical as to either their natural or manmade conditions and therefore may justify different treatment."].) We cannot say, as a matter of law, all revetments will exacerbate erosion. Here, the Commission had no evidence at all establishing this revetment would cause erosion at this beach.

We must therefore conclude no substantial evidence exists to justify a "nexus" between the revetment and the public access requirement. Under *Nollan* the access requirement must be deemed a "taking" of Colony's property.

The Commission relies on *Whaler's Village Club* v. *California Coastal Com.* (1985) 173 Cal.App.3d 240 [220 Cal.Rptr. 2]. *Whaler's Village* indeed held nonsite-specific expert studies on the general effects of revetments on beaches could be substantial evidence in support of a Commission easement requirement. (173 Cal.App.3d at pp. 260-261.)[14]

The Commission's reliance on *Whaler's Village* is misplaced. First, the facts are distinguishable. There is nothing in *Whaler's Village* to suggest the beach in that case was unusual, save possibly its susceptibility to erosion along with other beaches in Ventura County. There is no suggestion its wave patterns were different than other beaches. Moreover, in *Whaler's Village* the administrative record apparently did not contain affirmative evidence about the necessity to have knowledge of a specific beach in order to make a "rational" estimate of any erosion problem.

---

[14] The operative language from *Whaler's Village* is found in two passages on pages 260 and 261 of the opinion:

"There is substantial evidence in the administrative record to support the staff's conclusion that seawalls and revetments tend to cause sand loss from beach areas in front of and adjacent to them even if they protect immediate structures. Studies cited in staff reports concerning other permit applications before the Commission confirm the staff's finding that 'by artificially building up the slope of the shore area, seawalls and revetments of this type tend to cause a landward retreat of the mean high tide line, potentially affecting the boundary between public and private lands along the beaches adjacent to the project as well as on the project site itself.' " (173 Cal.App.3d at p. 260.)

"The Commission had sufficient information before it to conclude that, due to construction of this revetment and others up and down the coast, the erosive nature of the beaches in Ventura County coupled with the tendency of seawalls and revetments to increase the sand loss on beaches with a tendency to recede constitutes a cumulative adverse impact and places a burden on public access to and along state tide and submerged lands for which corresponding compensation by means of public access is reasonable. [Citations omitted.] Staff reports concerning various applications before the Commission referred to surveys of the Army Corps of Engineers and other experts concerning shoreline erosion along the California coast and, in particular, beach erosion in Ventura County. Opinion evidence of experts in environmental planning or ecological sciences is a permissible basis for decision. [Citation omitted.]" (173 Cal.App.3d at p. 261.)

Second, *Whaler's Village* employed a mere "rational basis" test in deciding nonsite-specific evidence would be sufficient to pass constitutional muster in a "taking" case. Given such a test, *Whaler's Village* assumed no need for a "direct nexus" between the burden and the condition. It was enough the project incurred "incidental" effects on the public's right to shoreline access.[15]

*Nollan*, however, changed the standard of constitutional review in takings cases. Whether the new standard be described as "substantial relationship,[16] or "heightened scrutiny,"[17] it is clear the rational basis test employed by *Whaler's Village* no longer controls.[18] While general studies may be sufficient to establish a mere rational relationship between revetments and erosion, *Nollan* requires a "close connection" between the burden and the condition.[19] ■ At the very least, a "close connection" entails evidence more "substantial" than general studies which, because of unique or unusual wave conditions, may not even apply to the case at hand. Substantial evidence must be reasonable in nature, credible, and of solid value. (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Evidence which may not necessarily even apply to the case at hand hardly meets such a definition.

---

[15] See generally 173 Cal.App.3d at pages 260-261, and in particular the following: "Thus, the validity of the condition is not destroyed because the development has no *direct* nexus to the condition, the benefit to the public is greater than to the developer, or future needs are taken into consideration. [Citation and fn. omitted.] It is enough that the project 'contributes, at least in an incidental manner' to the need for a particular extraction. [Citation omitted.]"

[16] See Peterson, *Land Use Regulatory "Takings" Revisited: The New Supreme Court Approaches* (1988) 39 Hastings L.J. 335, 338: "Justice Scalia, writing for the majority of five, concluded that to pass muster under the just compensation clause, an enactment must bear a substantial relationship to a valid public purpose, not merely a rational relationship, the common standard in due process and equal protection challenges." (Fn. omitted.)

[17] See *The Supreme Court, 1986 Term* (1987) 101 Harv. L.Rev. 7, 248-249: "Yet the Court expressly refused to adopt the standard of minimum rationality advocated by Justice Brennan and insisted instead that there must be a 'substantial advancing' of the government purpose. The Court thus articulated a standard of heightened scrutiny for regulations challenged under the takings clause." (Fn. omitted.)

[18] See Michelman, *Takings 1987* (1988) 88 Colum. L.Rev. 1600, 1606: "It was this lateral-passage condition that the Court found to constitute a taking. [¶] The Court so found by a course of reasoning that turned . . . on subjecting the instrumental merit of the Commission's action to a distinctly more active and intensive judicial reexamination than the kind of desultory, 'rational basis' review that the Court has for the last half-century been applying to police-power regulations affecting economic interests, most notably including land-use regulations." (Fn. omitted.)

See also 101 Harv.L.Rev., *supra*, at p. 247: "The *Nollan* decision . . . indicates that all regulations will now be subjected to a level of scrutiny far higher than the Court previously has used in assessing claims of regulatory takings."

[19] See Peterson, 39 Hastings L.J., *supra*, at p. 358: "To pass muster, a governmental act will require careful documentation of legitimate purposes and a close connection between the purpose and the act itself."

Third, *Whaler's Village* is not persuasive on the merits as to the use of nonsite-specific studies. The question raised by the homeowners in *Whaler's Village* was whether there was substantial evidence their "particular" revetment created a public burden because seawalls "in general" tend to increase erosion.[20] The opinion, however, never directly answered this question. Rather, the opinion referred to "surveys of the Army Corps of Engineers and other experts concerning shoreline erosion along the California coast and, in particular, beach erosion in Ventura County," pointed out "opinion evidence" is a "permissible basis for decision," noted the "competency" of the record had been stipulated to, and then concluded, as an afterthought while discussing another subject,[21] the easement condition was "supported by the evidence in the record." (*Whaler's Village, supra,* 173 Cal.App.3d at p. 261.)

*Whaler's Village* thus assumed it was enough to cite "opinion evidence" about beach erosion to refute the homeowners' contention. But this was not enough. It was still necessary to show the particular revetment before the court created at least some burden on public access. This the opinion did not do. Rather, the opinion *assumed* such a burden (albeit a "small" one) without ever proving it. To have proven the existence of the burden, the opinion would have had to demonstrate one of two things: either the "opinion evidence" established there would be exacerbated erosion *in every possible case* where a revetment were built or (2) the opinion evidence showed the particular revetment at issue would cause exacerbated erosion.[22] The opinion, however, did neither. It is therefore not persuasive on the subject of the substantiality of nonsite-specific evidence.

Accordingly, *Whaler's Village* does not compel a contrary result in this case.

---

[20] See *Whaler's Village, supra,* 173 Cal.App.3d at page 259: "In point, respondent argues that the Commission found a public 'burden' because seawalls *in general* tend to cause additional sand scour on any historically eroding beach but did not find that this particular revetment caused such damage."

[21] The other subject was whether there was a reasonable relationship between the goals of the coastal act and the easement condition. See *Whaler's Village, supra,* 173 Cal.App.3d at page 261: "Therefore, the condition of offering to dedicate an easement for public access was reasonably related to one of the principal objectives of the coastal act, which is to provide for maximum access to the coast by all the people in this state [citation omitted] and was supported by the evidence in the record."

[22] There is a difference between opinion evidence about the effects of revetments generally and the effect of a particular revetment. The case at bar is a good example. Both sides offered "opinion evidence." Only one side, however, offered opinion evidence bearing on the particular revetment at issue.

CONCLUSION

Without any site-specific evidence supporting the Commission's decision, we cannot say the Commission had "substantial evidence" justifying the need for an easement over Colony's property. We therefore reverse with directions to the trial court to modify the judgment in accord with the views expressed herein.[23]

Sonenshine, J., and Moore, J., concurred.

[23] In a petition for rehearing or modification of opinion, the Commission asks us to remand the matter back to the Commission for further proceedings. The Commission has apparently forgotten it stipulated before the trial court the matter *not* be returned for a second review.