[No. A051759. First Dist., Div. Three. Jan. 31, 1992.]

BLUE JEANS EQUITIES WEST, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Respondent.

**COUNSEL**

Ellman, Burke, Hoffman & Johnson and Howard N. Ellman for Plaintiff and Appellant.

Ronald A. Zumbrun, Edward J. Connor, Jr., and Richard M. Stephens as Amici Curiae on behalf of Plaintiff and Appellant.

Louise H. Renne, City Attorney, Robin M. Reitzes, Deputy City Attorney, and George E. Krueger for Defendant and Respondent.

## Opinion

**WHITE, P. J.**—In this action we consider whether the heightened scrutiny test alluded to in *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141] (hereafter *Nollan*) should be applied to San Francisco's Transit Impact Development Fee (TIDF) Ordinance. (Ord. No. 224-81, codified at S. F. Admin. Code, § 38.1 et seq.) We conclude the *Nollan* analysis is applicable only to "possessory takings," rather than "regulatory takings," and does not apply to the TIDF.

### Facts and Procedural Background

Plaintiff Blue Jeans Equities West is the owner and developer of Levi's Plaza, a five-building office, retail and condominium complex in the north or northeast waterfront section of San Francisco. This area of San Francisco is located away from the financial district, the traditional area of downtown office space. At the time of the project's conception, the main tenant was to be Levi Strauss & Company, which was then located in the financial district of the city. Prior to construction of the complex, a final environmental impact report was prepared by the San Francisco Department of City Planning. Among other things, the report discussed the adverse impact the project would have on transportation.[1]

The permit for Levi's Plaza was approved by the San Francisco Planning Commission's Resolution No. 8142 on January 4, 1979. The resolution contained a condition in its transit mitigation section, designated as paragraph 5(c), which provided: "The owner of the project shall make a good-faith effort to participate in future funding mechanisms to assure adequate transit service to the area of the city in which the project is located."

---

[1]The report states in pertinent part: "Employees arriving by BART, AC Transit, SAMTRANS, Southern Pacific, and the ferries would have to transfer to another mode (MUNI) to reach the project site. The proportion of vehicle drivers among Levi Strauss employees would tend to increase from about 16% to about 17.5%. Sixteen additional bus runs on Routes 15/42 and 32 would have to be operated during the peak hour to provide adequate capacity to sustain the 17.5% vehicle-driver modal split. This would represent about 4-minute headways on the combined 15 and 42 routes and about 6-minute headways on Route 32."

On May 5, 1981, the San Francisco Board of Supervisors enacted the TIDF ordinance. As our Supreme Court described it: "The ordinance, which became effective the following month, requires developers of downtown buildings containing new office space to pay a TIDF as a condition of issuance of a certificate of completion and occupancy. [Citation.] The TIDF, not to exceed $5 per square foot of new office space, provides revenue for the municipal railway to offset the anticipated costs of the increased peak-period ridership generated by the new office space over the useful life of each office building. [Citation.]" (*Russ Bldg. Partnership* v. *City and County of San Francisco* (1988) 44 Cal.3d 839, 844-845 [244 Cal.Rptr. 682, 750 P.2d 324] (hereafter *Russ II*).) At the time of its enactment, plaintiff had not yet received a certificate of completion for Levi's Plaza.

Plaintiff filed a complaint for declaratory relief against the city, contending the TIDF ordinance is unlawful and invalid as applied to the Levi's Plaza project and the TIDF may not be imposed with respect to plaintiff. While the case was pending, the parties stipulated to the fee calculation and plaintiff deposited the agreed amount, over $3.1 million, in trust, pending the case's outcome.

The trial court entered judgment for defendant, finding that the TIDF ordinance is not an unconstitutional "taking" on its face or as applied to plaintiff, plaintiff acquired no vested right to build or use Levi's Plaza without payment of the TIDF, and defendant is not estopped from requiring plaintiff to pay the TIDF. This appeal followed.

## DISCUSSION

In *Russ Bldg. Partnership* v. *City and County of San Francisco* (1987) 199 Cal.App.3d 1496 [246 Cal.Rptr. 21] (hereafter *Russ I*), Division Five of this District held the San Francisco TIDF ordinance was a valid development fee, which could not be challenged under articles XIII A and XIII B of the California Constitution or the equal protection and due process clauses of the federal and state Constitutions. In essence, the opinion finds the TIDF a fee, rather than a special tax. (199 Cal.App.3d at p. 1507.)

In *Russ II*, the Supreme Court addressed the question of whether the TIDF ordinance could be applied to projects which, at the time of the enactment of the ordinance, were in the course of construction pursuant to building permits conditioned on the developers' participation " 'in a downtown assessment district, or similar fair and appropriate mechanism, to provide funds for maintaining and augmenting transportation service . . . .' " (*Russ*

*II, supra*, 44 Cal.3d at p. 843.)[2] The high court concluded that the condition encompassed the TIDF, and held that the TIDF could be imposed on the projects without impairing the developers' vested rights. (*Ibid.*) However, the *Russ II* court expressly declined to address whether the TIDF violated the takings clause of the United States Constitution, as interpreted in *Nollan*. (*Russ II, supra*, 44 Cal.3d at p. 845, fn. 6.)

■ In *Nollan*, the United States Supreme Court held the California Coastal Commission had violated the Fifth Amendment by conditioning a building permit for beachfront property on the owners' dedication of an easement allowing the public to walk on the portion of the property nearest to the ocean. The condition requiring an easement violated the "taking" clause, because it did not serve a governmental purpose related to the permit to rebuild. (*Nollan, supra*, 483 U.S. at p. 838.) At least one California court has interpreted the *Nollan* holding as providing "there must be a substantial connection, or 'nexus' between the public burden created by the construction and the necessity for the easement." (*Surfside Colony, Ltd.* v. *California Coastal Com.* (1991) 226 Cal.App.3d 1260, 1267 [277 Cal.Rptr. 371], fn. omitted.) This interpretation is based, in part, on footnote 3 of the *Nollan* opinion: "[O]ur opinions do not establish that these standards are the same as those applied to due process or equal protection claims. To the contrary, our verbal formulations in the takings field have generally been quite different. We have required that the regulation 'substantially advance' the 'legitimate state interest' sought to be achieved, [citation], not that 'the State "*could rationally have decided*" that the measure adopted might achieve the State's objective.' [Citations.]" (*Nollan, supra*, 483 U.S. at p. 834, fn. 3.)

A threshold issue is whether the *Nollan* nexus test should be applied to the case at bench. Plaintiff takes an affirmative position, while defendant disagrees.

■ It is settled that any regulation of economic interests which "goes too far" becomes a "taking" under principles of inverse condemnation. (*Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 325-326, 43 S.Ct. 158, 28 A.L.R. 1321]; *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304, 316 [96 L.Ed.2d 250, 264-265, 107 S.Ct. 2378]; *Golden Cheese Co.* v. *Voss* (1991) 230 Cal.App.3d 727, 731 [281 Cal.Rptr. 602].) However, there is no set formula for determining what constitutes a "taking"; the courts rely instead on ad hoc, factual inquiries into the circumstances of individual cases. (*Connolly* v. *Pension Benefit Guaranty Corp.*

---

[2]*Russ II* left intact the *Russ I* holding that the TIDF was a valid development fee. (*Russ II, supra*, 44 Cal.3d at p. 845.)

(1986) 475 U.S. 211, 224 [89 L.Ed.2d 166, 178-179, 106 S.Ct. 1018]; *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104, 123-124 [57 L.Ed.2d 631, 647-648, 98 S.Ct. 2646].)

In *Agins v. Tiburon* (1980) 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138], the United States Supreme Court stated: "The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests, [citation], or denies an owner economically viable use of his land, [citation]. The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest." (*Id.*, at p. 260.) *Nollan* has been construed as refining the first prong of the *Agins* test "to require that the regulation advance the precise state interest which avowedly motivated it." (*Long Beach Equities, Inc. v. County of Ventura* (1991) 231 Cal.App.3d 1016, 1029 [282 Cal.Rptr. 877].)

However, the high court appears to make a distinction between "regulatory takings," i.e., economic regulation, most forms of zoning, and other restrictions on land use, and "possessory takings," where the government, or an authorized third person, physically intrudes upon or appropriates the property. (See Manheim, *Tenant Eviction Protection and the Takings Clause*, (1989) Wis. L.Rev. 925, 939.)

*Nollan* specifically points out that "our cases describe the condition for abridgment of property rights through the police power as a '*substantial* advanc[ing]' of a legitimate state interest. We are inclined to be particularly careful about the adjective where the actual conveyance of property is made a condition to the lifting of a land-use restriction, since in that context there is heightened risk that the purpose is avoidance of the compensation requirement, rather than the stated police-power objective." (*Nollan, supra,* 483 U.S. at p. 841, italics in original.) Based on this language, most legal scholars have concluded the *Nollan* strict scrutiny approach is limited to unconstitutional conditions and possessory takings cases. (See, e.g., Manheim, *supra,* Wis. L.Rev. at p. 950; Lawrence, *Means, Motives, and Takings: The Nexus Test of Nollan v. California Coastal Commission* (1988) 12 Harv. Envtl. L.Rev. 231, 263; but see Been, *"Exit" as a Constraint on Land Use Exactions: Rethinking the Unconstitutional Conditions Doctrine* (1991) 91 Colum. L.Rev. 473.)

Case law subsequent to *Nollan* appears to confirm this view. *Pennell v. San Jose* (1988) 485 U.S. 1 [99 L.Ed.2d 1, 108 S.Ct. 849], concerns a city

rent control ordinance that permits consideration of "hardship to a tenant" when determining whether to approve a rent increase proposed by a landlord. In addressing whether rent control was *per se* a taking the court stated: "[W]e have 'consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.' " (*Id.*, at p. 12, fn. 6, quoting *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 440 [73 L.Ed.2d 868, 885, 102 S.Ct. 3164].) *Pennell* appears to reaffirm the traditional view that as long as governmental regulations do not require a landowner to suffer the physical occupation of a portion of his real estate, the regulations will be analyzed as nonpossessory governmental activity. (See *Loretto*, *supra*, 458 U.S. at p. 440.)

More on point, in *Commercial Builders* v. *Sacramento* (9th Cir. 1991) 941 F.2d 872, commercial developers challenged a city ordinance that conditioned nonresidential building permits on payment of a fee to offset burdens associated with the influx of low-income workers to work on such developments. The developers argued that pursuant to *Nollan*, an ordinance that imposes an exaction on developers can be upheld only if it can be shown that the development is directly responsible for the social ill that the exaction is designed to alleviate. Citing *St. Bartholomew's Church* v. *City of New York* (2d Cir. 1990) 914 F.2d 348, 357, footnote 6, *Adolph* v. *Federal Emergency Management Agency* (5th Cir. 1988) 854 F.2d 732, 737, and *Naegele Outdoor Advertising, Inc.* v. *City of Durham* (4th Cir. 1988) 844 F.2d 172, 178, the Ninth Circuit concluded *Nollan*'s heightened scrutiny test was inapplicable to regulations that do not constitute a physical encroachment on land. (*Commercial Builders*, *supra*, 941 F.2d at p. 874.)

Plaintiff principally relies on *Bixel Associates* v. *City of Los Angeles* (1989) 216 Cal.App.3d 1208 [265 Cal.Rptr. 347], to support its claim that a heightened scrutiny test should be employed. In *Bixel*, a developer was required to pay a fire hydrant fee as a condition of the issuance of a building permit. The fee was established by two city ordinances. The developer argued that the fee was a special tax which violated article XIII of the California Constitution. The Court of Appeal agreed, holding that the fire hydrant fee ordinances did not contain language embodying the required constitutional safeguards which must be employed in fashioning a valid

development fee.[3] (*Id.*, at p. 1220.) *Bixel* neither considered nor decided whether the fee constituted a taking in violation of the Fifth Amendment. (*Ibid.*)

In light of the above quoted language in *Nollan* and post-*Nollan* case law, we hold that any heightened scrutiny test contained in *Nollan* is limited to possessory rather than regulatory takings cases.

■ Plaintiff also contends condition 5(c) of its building permit did not contemplate payment of the TIDF. First, it submits the language of the condition, i.e., "the owner . . . shall make a good-faith effort to participate in future funding mechanisms to assure adequate transit service to the area of the city in which the project is located," denotes a voluntary rather than mandatory obligation.[4] We disagree. Good faith performance of a contract "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." (*Careau & Co.* v. *Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1393, fn. 15 [272 Cal.Rptr. 387], quoting Rest.2d Contracts (Tent. Draft Nos. 1-7) § 231, com. a.) Thus, the "good faith" language in condition 5(c) may not be employed to make plaintiff's participation discretionary.

■ Plaintiff next asserts the condition was devoted to improving transit service "to the area of the city in which the project is located." It points out this condition was identical with the permit conditions for Wharf Park I and II, which are residential projects.[5] Plaintiff compares this language with the articulated purpose of the TIDF ordinance and the wording contained in the permits for projects considered in *Russ I*, and concludes the commitments were different. We find the argument unpersuasive.

The TIDF ordinance was enacted "[i]n order to be able to provide public transit services for new development in the Downtown Area, . . . . [¶] It is

---

[3]The *Bixel* court explicitly distinguished the imprecise basis for determining the fee in that case with the methodology employed and described in *Russ I*. (*Bixel, supra,* 216 Cal.App.3d at p. 1219.)

[4]In its statement of decision, the trial court stated: "The Court further finds that the phrase 'good faith effort' was not included to allow mere voluntary participation in the support of transit funding mechanisms, but anticipates BJEW's participation in whatever funding mechanism the City and County could best devise that reasonably met the requirements of the transit demands. The phrase does not connote the mandatory language of 'shall,' however, such mandatory language was not necessary. The phrase was intended to acknowledge notice of an obligation to participate in whatever reasonable funding mechanism was devised."

[5]The Levi's Plaza approval provided that plaintiff "shall make a good-faith effort to develop . . . housing on a nearby site, for low- and moderate-income occupants." Plaintiff complied with this provision by building Wharf Park I and II, residential projects located between Levi's Plaza and Pier 39.

the purpose of this ordinance to require developers of new development in the Downtown Area to pay a fee which is related directly to the incremental financial burden imposed upon the Municipal Railway both for initial capital outlay for the acquisition of rolling stock and the construction of facilities; and for the long term operation, maintenance and replacement of those facilities once they are in place." (S.F. Admin. Code, § 38.3.) Each of the plaintiffs in *Russ I* and *Russ II* had, as a condition of its building permit, the following language: " 'In recognition of the need for expanded transportation services to meet peak demand generated by cumulative office development in the downtown area, [the developer] shall participate in a downtown assessment district, or similar fair and appropriate mechanism, to provide funds for maintaining and augmenting transportation service, should such a mechanism be established by the City.' " (*Russ II, supra,* 44 Cal.3d at p. 844.) While the wording of the condition contained in the *Russ* plaintiffs' permits differs from that in condition 5(c), our Supreme Court found the conditions substantially similar. (44 Cal.3d at p. 844, fn. 2.)

The fact that Levi's Plaza is located away from the traditional downtown area does not alter our view that the project is subject to the TIDF. Plaintiff stipulated that the project is within the geographic downtown area as defined by the ordinance. Plaintiff had notice that its development would adversely impact on public transportation and agreed to participate in funding mechanisms to assure adequate transit service to its project.

DISPOSITION

The judgment is affirmed.

Merrill, J., and Werdegar, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 29, 1992.