[No. D017441. Fourth Dist., Div. One. Oct. 25, 1994.]

WESTWINDS MOBILE HOME PARK, Plaintiff and Appellant, v. MOBILEHOME PARK RENTAL REVIEW BOARD, Defendant and Respondent;
CITY OF ESCONDIDO, Real Party in Interest.

COUNSEL

Robert J. Jagiello, Callahan & Gauntlett and Jim Mahacek for Plaintiff and Appellant.

David R. Chapman, City Attorney, Jeffrey Epp, Assistant City Attorney, Endeman, Lincoln, Turek & Heater, Donald R. Lincoln and Linda B. Reich for Defendant and Respondent and for Real Party in Interest.

OPINION

**FROEHLICH, J.**—Appellant Westwinds Mobile Home Park, a general partnership (hereafter Owner), owns a mobilehome park in Escondido,

California (hereafter City). That park is subject to an Escondido rent control ordinance which has generated significant appellate activity.[1] Owner sought a rate increase under that ordinance, and the review board granted only a fraction of what Owner had requested. This lawsuit followed.

Owner's claims on appeal fall into three basic categories. First, it claims the decision of the review board to grant it a mere $4 per month per lot rate increase is not supported by substantial evidence. Second, it raises procedural due process complaints about the ordinance. Finally, it claims the ordinance is facially defective because it effects a regulatory taking without substantially advancing a legitimate state interest.

## I. *Factual Background*

### A. *History*

In 1989, approximately one year after the rent control ordinance went into effect, Owner purchased the Westwinds Mobile Home Park (hereafter the park). Owner paid $1.7 million, composed of promissory notes in the approximate amount of $1,012,000 and the balance in cash. Owner acquired both the park and a number of the coaches on the site.

In early 1990, Owner sought a rent increase of $20 per month per space on 62 of the 66 spaces. In May 1990, Owner was granted a $15 per month increase, and thereafter raised the monthly rate to $190 on the bulk of the spaces. Owner does not challenge this 1990 rate increase.

### B. *Disputed Rate Increase*

One year later, Owner applied for another rate increase, requesting an additional $50 per month for 65 of the 66 spaces. The primary justifications for this increase were (1) Owner was losing nearly $50,000 per year at the current rental rates, depriving it of a fair return on its investment; and (2) comparable parks had much higher rental rates.

City staff gathered information from Owner, and then informed the residents of their opportunity to comment on the proposal. Numerous residents commented on the hardships a $50 increase would create, and also criticized the maintenance and amenities provided by the park. However, the City

---

[1]The ordinance was challenged in (*Yee* v. *City of Escondido* (1990) 224 Cal.App.3d 1349 [274 Cal.Rptr. 551], affd. 503 U.S. 519 [118 L.Ed.2d 153, 112 S.Ct. 1522] (1992), hereafter *Yee I*), and subsequently withstood a separate challenge in (*Yee* v. *Mobilehome Park Rental Review Bd.* (1993) 17 Cal.App.4th 1097 [23 Cal.Rptr.2d 1], hereafter *Yee II*).

Building Department reported the park's overall appearance to be "good" with no serious code violations.

In September 1991, a City staff report was issued which summarized Owner's proposed rate structure and justifications for the increase; it also summarized residents' responses. Additionally, the report discussed the factors which the rent control ordinance indicates are to be considered by the board, and also analyzed some sample rate-increase calculations.

At the September 1991 public hearing on Owner's application, the board heard testimony from both Owner's representative and various tenants opposed to the rate increase. The board ultimately granted a $4 increase rather than the $50 increase sought by Owner.

## C.  *The Lawsuit*

Owner filed a petition for administrative mandamus, along with a complaint for declaratory relief and damages, challenging the board's action. Owner's first cause of action alleged the board's action was a "taking" because it denied Owner a "fair rate of return" on its investment. Owner's second cause of action alleged the ordinance was facially invalid because its lack of specificity regarding the standards guiding rent increases violated procedural due process. Owner's third cause of action for mandamus alleged the board's action was without substantial evidentiary support and an abuse of its discretion for essentially the same reason Owner gave to support its first cause of action—that is, the board's action denied Owner a fair rate of return on its investment.[2] Owner's fourth cause of action alleged the failure to grant the rate increase constituted a "taking" under *Hall* v. *City of Santa Barbara* (9th Cir. 1987) 833 F.2d 1270. Owner's final "cause of action" sought attorney fees.

City's demurrer to all causes of action except the third for mandamus was sustained without leave to amend. The matter then proceeded to hearing on the mandamus claim.

The superior court reviewed the record, concluded the board had substantial evidence to support its rate increase, and denied the petition for writ of mandate. To support the decision to limit the increase to $4 per month, the court cited the following evidence: (1) Owner owned 20 mobilehomes in the

---

[2]Owner also purported to state a separate "cause of action" for damages under Code of Civil Procedure section 1095. That section permits an award of damages against the public entity if the petitioner succeeds in his action for writ of mandamus.

park and was unable to segregate expenses for the park from those attributable to the units; (2) Owner was able to offset some park losses by the income generated from the rental of these units; (3) the park lacked many amenities compared to other parks and needed repairs; and (4) Owner's land was appreciating in value.

## II.   Standard of Review

█    The parties initially dispute the proper standard for our review of the board action. Owner cites *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141] for the proposition that "close scrutiny" is required. City, on the other hand, urges that we are to use the more deferential "substantial evidence" standard to test the validity of the board's decision.

This court has previously held that review of decisions by mobilehome rent control boards are governed by the "substantial evidence" standard. (See *San Marcos Mobilehome Park Owners' Assn.* v. *City of San Marcos* (1987) 192 Cal.App.3d 1492, 1498-1502 [238 Cal.Rptr. 290].) We specifically reiterated this standard of review in *Yee II* when reviewing a decision of the same rent control board (operating under the same ordinance) involved here. (See *Yee II, supra,* 17 Cal.App.4th 1097, 1106.)

Owner's attempt to invoke the "close scrutiny" standard is based on an expansive reading of *Nollan. Nollan* held that when a statute physically takes property without compensation to the owner, it cannot be upheld merely because a legislature could "rationally have decided" the law might achieve a state objective. Instead, when physical takings are involved, the court more closely scrutinizes the law to determine whether it "substantially advances" a "legitimate state interest." (*Nollan* v. *California Coastal Comm'n, supra,* 483 U.S. at pp. 834-835 and fn. 3 [97 L.Ed.2d at pp. 687-688].) However, *Nollan* involved a statute which physically expropriated property. The statute involved here, however, merely regulates the use of land and does not impose a physical taking. (*Yee I, supra,* 503 U.S. 519, 527-528 [118 L.Ed.2d 153, 165-166, 112 S.Ct. 1522, 1529].) Thus, *Nollan*'s "close scrutiny" standard is irrelevant.

Merely deciding that the standard is "substantial evidence," however, is not sufficient to end the inquiry, because "[a]pplication of the test inherently requires that the reviewing court first determine the question, 'Substantial evidence of what?'" (*Yee II, supra,* 17 Cal.App.4th at p. 1106.) This court concluded in *Yee II* that the "what" under the Escondido ordinance, as interpreted by the board, was whether the rental rates provided a "fair rate of

return on the cost of that applicant's equity investment." (*Ibid.*) We now turn to this question.

III.  *The Decision That a $4-per-month Increase Is Adequate to Provide a "Fair Rate of Return" Is Not Supported by Substantial Evidence*

■      Owner and City do not seriously dispute that price controls on rent are within the police power if they are reasonably calculated both to eliminate excessive rents and to provide the owner with a "just and reasonable" return on its property. (See, e.g., *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 816 [258 Cal.Rptr. 161, 771 P.2d 1247].) On first consideration, the evidence that the park experiences yearly *losses* would suggest the owner is getting no return, or even a negative one, on its investment, contrary to the constitutional mandate against confiscatory regulation.

City seeks to support the board's action by asserting two independent contentions. First, City claims the new rate *does* provide a "fair" return on Owner's investment. Second, even assuming the rate of return is *not* "fair," City claims there is still evidence to justify not granting Owner's requested rate increase. We address each contention.

A.  *Does a Rate of $194 Provide a "Fair" Rate of Return?*

■      Owner provided evidence that when its spaces were at the $190 level, it lost $49,500 in the fiscal year ending October 31, 1990, representing $10,566 in operational losses and $38,942 in depreciation.[3] The analysis of the board's staff for the next fiscal year (ending October 1991), using figures from the first four months of that year, projected a net loss of over $23,000, and indicated the "break even point" (a net income of $0) would require a rent increase of $29.51 per month. Instead, a $4 increase was approved.

City claims this $4 increase does provide a fair return on investment. It uses the "historical cost" approach to measure the rate of return.[4] Under this approach the net investment is measured by acquisition cost plus capital improvements minus accumulated depreciation. (*Yee II, supra,* 17 Cal.App.4th at p. 1104, fn. 5.) Here the net book value would be $1,725,374. The next step is to determine "operating profit," calculated by taking the

---

[3]The staff report indicated the operational loss (i.e., net of depreciation) was $27,810, a larger loss than claimed by Owner. The disparity between the numbers is unexplained.

[4]Owner claims on appeal that we must use "fair value" of the property, rather than the cost of acquisition, to evaluate the rate of return. This court has already decided this issue adversely to Owner's claim. (*Palomar Mobilehome Park Assn.* v. *Mobile Home Rent Review Com.* (1993) 16 Cal.App.4th 481, 485 [20 Cal.Rptr.2d 371].)

annual profit/loss and adding to it the interest expense; here, when the interest expense of $94,297 is re-added to the loss of $49,500, Owner is left with an "operating profit" of $44,797. The final step is to divide the operating profit ($44,797) by the net book value of the investment ($1,725,374), here yielding a return of approximately 2.6 percent prior to the rental increase. (*Palomar Mobilehome Park Assn.* v. *Mobile Home Rent Review Com., supra,* 16 Cal.App.4th at p. 487.) This is the most generous measure apparently applicable to this case.[5] When the additional revenues of $3,100 from the $4 per month rate hike granted by the board are added to the prior "operating profit" of $44,797 and then divided by the net book value of the investment, the post-increase rate of return edges up to 2.78 percent.

While these calculations produce the *rate* of return, they do not provide substantial evidence that 2.78 percent is a *fair* rate of return. There is absolutely no evidence that investments in which the investor has the potential for capital appreciation and possible tax shelter benefits provide returns of a similar nature. Indeed, we here review a decision by the same board whose decision was reviewed in *Yee II.* In *Yee II* that same board appeared to "assume" that a 10 percent return was appropriate. In that case we held the board's action of awarding a rental increase producing a 4.2 percent return was not substantively supported because there was no *evidence* that like investments (i.e., ones involving similar risks, with similar capital appreciation and tax benefits to the owners) produced similar returns. (*Yee II, supra,* 17 Cal.App.4th at pp. 1109-1110.)

City argues the nominal rate of return (2.78 percent) must be augmented by (1) the appreciation in the value of the asset and (2) the tax shelter benefits accruing to the owner. Addition of these amounts, City argues, increases the rate of return in undefined amounts. However, our decisions in *Yee II* and *Palomar Mobilehome Park Assn.* v. *Mobile Home Rent Review Com., supra,* 16 Cal.App.4th 481 doom City's arguments. The "appreciation" factor is not *added* to operating profits; instead, it constitutes a factor which an expert may consider in evaluating what rate of return an investor would demand in light of potential capital appreciation. (*Palomar Mobilehome Park Assn.* v. *Mobile Home Rent Review Com., supra,* 16 Cal.App.4th at p. 489.) Similarly, tax shelter benefits are not added to the return but constitute a potential factor which an expert might consider as affecting the rate of return an investor would demand. (*Yee II, supra,* 17 Cal.App.4th at p. 1110.)

---

[5]City tries to increase the return by arguing the "return on equity" approach. However, City's calculations falter because City assumes that the same "operating profit" of $44,797 should be divided by the partner's book equity of $631,170. When using the "equity" system, however, the interest expense is *not* added back into the annual profit/loss figure. (*Yee II, supra,* 17 Cal.App.4th at p. 1104, fn. 5.)

There is thus no evidence, expert or otherwise, to support the board's implicit conclusion that a 2.78 percent return is "fair." Moreover, it appears the board, as well as the trial court, may have relied on an improper factor (capital appreciation) to augment the return Owner had realized.

B. *Is There Evidence to Support a Conclusion That, Assuming 2.78 Percent Is Below the Rate Ordinarily Acceptable to a Prudent Investor, Such Rate Is Still Appropriate on These Facts?*

City alternatively argues that even if the minimal rate increase produces a rate of return below that which would pass scrutiny under a pure "fair rate of return" test, it can be justified here. First, City claims Owner paid too much for the property and hence it is Owner's bad business choice, not the rental rate, which is depressing the rate of return. Second, City claims the maintenance problems at the park, as well as other factors, support a lower rent increase.

City argues the calculation of a "fair" rate of return is made only on "prudent" investments and excludes imprudent investments. (See *Duquesnse Light Co. v. Barasch* (1989) 488 U.S. 299, 310-312 and fn. 7 [102 L.Ed.2d 646, 658-660, 109 S.Ct. 609] [in calculating "rate base" for profit margin, not improper to exclude losses from canceled nuclear plant].) City claims here that Owner simply paid too much for the park. However, there is no *evidence* showing this park was not worth $1.7 million in 1989. To the contrary, since there is no suggestion this was a "collusive sale," but was instead an arm's-length transaction between a willing buyer and seller, the price would appear to be proper.[6]

City seeks to demonstrate the price was too high by pointing out that Owner knew rents were controlled, and therefore it was imprudent to pay $1.7 million because the yearly debt service and taxes exceeded the controlled rents. We are unconvinced by this argument. First, it is a "Catch-22" argument. It posits that a prudent investor will purchase only rent-controlled property for a price which provides him a fair rate of return at the then-current (i.e., frozen) rental rates. Having done so, however, the fair market

---

[6]The only contrary "evidence" cited by City to show the price was excessive consists of two letters from tenants opining Owner paid too much for the park. Opinions without factual support, by persons who are neither owners nor experts, hardly provide substantial evidence that Owner overpaid for the park. (*Abrams v. Motter* (1970) 3 Cal.App.3d 828, 843 [83 Cal.Rptr. 855].)

value is frozen ad infinitum because no one should pay more than the frozen rental rate permits; and existing rental rates are likewise frozen, since the investor is already realizing a "fair rate of return." Second, City's argument is unconvincing because the losses, on which City relies to show the price was "imprudent," were caused not by the price paid but by the fact that the purchase was partly financed rather than being an all-cash purchase. We have previously rejected the notion that permissible rental rates based on a fair rate of return can vary depending solely on the fortuity of how the acquisition was financed. (See *Palomar Mobilehome Park Assn.* v. *Mobile Home Rent Review Com., supra*, 16 Cal.App.4th at p. 488.)

■    City alternatively points to "maintenance problems" at the park as supportive of the board's decision to grant a low rent increase. The residents complained about dirty facilities; "inadequate" street lighting, sewer and drainage; and outdated circuit breakers. However, the City Building Department report, examining some 25 criteria for the park, found Owner had complied with every criterion applicable to the park, and even complied with several criteria from which the park was exempt. It concluded the "overall appearance of the park is good [and] no serious problems or code violations were noted . . . ." Given that report and that the board's findings did not recite maintenance problems as a basis for denying Owner the rent increase otherwise warranted, such basis cannot serve to justify the decision. Moreover, even had the board intended to find that maintenance problems justified its decision, this court has previously observed (1) those problems must be substantial rather than trivial, and (2) there must be some effort to quantify the cost of repairs or the amount of rate increase which would be appropriate after completion of repairs, to assure there is some "proportionality between the nature of the transgression and the extent of the penalty." (*Yee II, supra*, 17 Cal.App.4th at pp. 1110-1111.)

Finally, City argues that the board expressly "considered" several of the other relevant factors such as the consumer price index increase over the previous year and the rental rates at other comparable parks, providing substantial support for the decision. However, this identical argument was made and rejected in *Yee II*. There the City sought to uphold the order by noting the board "considered all factors in reaching its conclusion." Rejecting that argument, we stated: "[This argument] recites what the Board did but not how it did it. Consideration of a factor alone does not inform of the manner in which the consideration affected the ultimate conclusion. The mere fact that all factors were 'considered' in no way guarantees that the ultimate result is constitutionally acceptable." (*Yee II, supra*, 17 Cal.App.4th at p. 1107.)

## IV. *The Ordinance Is Not Facially Unconstitutional*

Owner attacks the entire ordinance as unconstitutional. It first argues the statute violates procedural due process because its list of nonexclusive factors fails to provide sufficient guidelines to channel the decisionmaking process or to give an applicant notice of what he must show to succeed on an application. This argument is essentially the same as the one we rejected in *Yee II* (see 17 Cal.App.4th at p. 1105), and we will not revisit the issue here.

Owner also claims the statute fails to pass constitutional muster under the "taking" clause. It argues the ordinance does not "substantially advance" a "legitimate state interest."[7] We question whether this heightened scrutiny is applicable to nonphysical takings. (See *Blue Jeans Equities West* v. *City and County of San Francisco* (1992) 3 Cal.App.4th 164, 169-170 [4 Cal.Rptr.2d 114] [heightened scrutiny not applicable to nonphysical, regulatory takings].) Furthermore, were it necessary to reach this issue, we would find persuasive the holding in *Sandpiper Mobile Village* v. *City of Carpinteria* (1992) 10 Cal.App.4th 542, 549-551 [12 Cal.Rptr.2d 623], which rejected a substantively identical "facial challenge" to a mobilehome rent control statute.[8]

However, we are not required to reach the issue, because we reject Owner's attempt to characterize its attack on the ordinance as a facial rather than an "as applied" challenge. There is no taking unless the ordinance deprives the property owner of substantially all economically viable uses for his land. (*Sandpiper Mobile Village* v. *City of Carpinteria, supra,* 10 Cal.App.4th at p. 550.) Here, whether Owner is deprived of a fair return depends not on the ordinance per se but on whether the rent increase granted under the ordinance will permit Owner a fair return on its investment; hence the "taking" issue depends on how the statute is applied. (*Id.* at pp. 548-549.)

---

[7]Owner does not claim that his challenge, insofar as it rests on the contention that the statute effects a taking "as applied," is justiciable at this point. (See *Williamson County Regional Planning Com.* v. *Hamilton Bank* (1985) 473 U.S. 172 [87 L.Ed.2d 126, 105 S.Ct. 3108] [claim for "as applied" regulatory taking is unripe until applicant has exhausted state court remedies].)

[8]Owner's facial challenge here, as in *Sandpiper*, argues the ordinance does not accomplish its purpose of preserving low-price housing, because new tenants wishing to buy an existing coach simply pay a premium reflecting the capitalized value of future rent savings and thus realize no rent savings. The *Sandpiper* court concluded it was for the Legislature, not the courts, to determine whether the economic objectives of the statute were advanced by the statute's effect. (10 Cal.App.4th. at p. 551.) We agree that it is for the Legislature to weigh and resolve the economists' arguments over the wisdom of rent and price controls, so long as the affected property owner is not deprived of all economically viable uses for his property.

## Disposition

The judgment is reversed. Respondent shall bear costs on appeal.

Benke, Acting P. J., and Huffman, J., concurred.